657 F.Supp. 718 (1986)
AMERICAN NATIONAL INSURANCE COMPANY, Plaintiff,
v.
George L. COE, d/b/a G.L.C. Insurance Agency, Defendant.
No. 86-1381C(5).
United States District Court, E.D. Missouri, E.D.
October 17, 1986.
Permanent Injunction April 2, 1987.
As Amended May 7, 1987.
*719 David W. Harlan, St. Louis, Mo., for plaintiff.
Louis Gilden & Norah J. Ryan, St. Louis, Mo., for defendant.

MEMORANDUM OPINION
LIMBAUGH, District Judge.
On July 9, 1986, at the request of plaintiff, this Court entered a temporary restraining order preventing defendant from soliciting, selling or attempting to sell life, health and accident insurance within a certain geographic boundary in the City of St. Louis. Plaintiff's request asserted that defendant had been a District Manager for plaintiff pursuant to a written employment agreement which contained a one-year non-compete covenant. Defendant was allegedly discharged by plaintiff for cause following which he formed his own insurance agency and began selling insurance in the area described in the non-compete covenant.
The restraining order was to be continuing until the Court could conduct an evidentiary hearing to determine whether a preliminary injunction should issue or the restraining order should be dissolved. This opinion constitutes the Court's findings of fact and conclusions of law, as required by rule.
Defendant asserts that plaintiff does not have the authority to terminate him and then attempt to enforce a non-compete agreement. Defendant next complains that no good cause existed for plaintiff to terminate him and therefore plaintiff did not have the right to enforce its non-compete agreement. Next, defendant asserts that the restrictive covenant is not enforceable as the one-year non-compete agreement is for too long a period and the area involved in which defendant may not compete is too broad. Finally, defendant avers that plaintiff discriminated against him because he is black and therefore, the termination was not implemented by plaintiff with clean hands.
In view of the issues raised, the Court will detail the facts and in particular those that may have been known to the plaintiff at the time of the discharge of defendant.
Plaintiff's principal business in the St. Louis area is to write policies of health, accident and life insurance for its customers. For the purpose of sales, plaintiff has divided the greater St. Louis area into districts. The district involved here for which the temporary restraining order was issued encompasses an area having boundaries beginning at Hamilton extended and Lindell; thence northerly on Hamilton to Page; thence easterly on Page to Union; thence northerly on Union to West Florissant; thence southeasterly on West Florissant to Interstate 70; thence southeasterly on 1-70 to Tucker extended; thence southerly on Tucker to Interstate 44; thence westerly on Interstate 44 to Kingshighway; thence northerly on Kingshighway to Lindell and thence westerly on Lindell to Hamilton extended. The area includes most of downtown St. Louis and a substantial portion of the north city area. Mostly black residents live in this district.
During the first part of 1986, plaintiff had 16 representatives selling its insurance in the district described, all 16 of which *720 were black. Defendant, also a black, had been the manager of the district described since October 20, 1985, and had sold insurance for plaintiff for 14 years before his discharge. Defendant had been a productive employee and had achieved award winning sales levels in his office.
The October 20, 1985, written employment agreement whereby defendant became a district manager for plaintiff was amended on January 21, 1986, by a one-page addendum to employment agreement. Section 14 on page 9 of the October agreement provides that:
My appointment as District Manager under this agreement may be terminated either by myself or by the company at anytime, without cause and without notice.
The January 21, 1986, addendum to the employment agreement contains the non-compete agreement which is set out as follows:
1. For a period of one (1) year from the date of the termination of my employment agreement, within the geographical limits of the district in which I was employed immediately prior to the termination of my employment agreement, or any other district in which I may have been previously employed, I shall not directly or indirectly do any of the following things, or aid or abet others to do so:
(a) Solicit, sell or attempt to solicit or sell any form of life, health, annuities and/or accident insurance.
(b) Contact any Company policyholder for the purpose of inducing or attempting to induce such policyholder to cancel, lapse or fail to renew such policyholder's polilcy (sic) with the Company.
(c) Induce or attempt to induce any of the Company's clerical force, agents, staff managers, district managers, regional representatives, or regional directors to terminate their employment with the Company, or to sell life, health, annuities or accident insurance for any other company.
(d) Retain in my possession or photostat or otherwise copy any of the Company's records, supplies, materials and forms, including but not limited to loan forms, cash surrender forms, requests for duplicate punch card forms, modification forms, change of beneficiary forms, Form 884 (Debit Route Order of Weekly and MDO policies), or any page or pages from the Agent's Service Book.
2. My violation of any of the above may be enjoined by all legal means available to the Company.
Plaintiff's sales representatives not only sell insurance but service the customer after the policies have been written. The representatives call on the customer and collect premiums which are paid monthly, bi-monthly and frequently on a weekly basis. The agents develop a close business relationship with their customers and maintain their own records or review periodically the company's records with respect to the insurance in force, the expiration dates of policies and the reasons for lapses. These policies are subject to a substantial lapse rate and frequently agents will collect new premiums and either reinstate the lapsed policy or cause new policies to be issued.
The May 14, 1986, termination of defendant was the result of an investigation made by plaintiff of events surrounding the purported sale of a life insurance policy by Savannah Berry, another of plaintiff's sales representatives.
The investigation began when defendant submitted to plaintiff's home office an application for a $100,000 life insurance policy with a $200,000 accidental death benefit on the life of Johnny Armstrong. Plaintiff's investigation was triggered by the death of Armstrong approximately 12 hours after he had purportedly signed the application for the insurance, and as the application was not processed until two days after the death and as the application for the purported $100,000 of insurance contained an ambiguity in that there was a comma after the first zero and after the second zero as well. (The ambiguity is shown as follows $10,0,000).
Plaintiff refused to write the policy after the completion of its investigation whereupon *721 the beneficiary listed on the application filed separate suit against plaintiff to collect the proceeds under the policy which she claims should have been written by the company. Plaintiff's investigation included interviewing parties involved, obtaining affidavits and engaging a handwriting expert for the purpose of analyzing the application.
As a result of plaintiff's investigation, it was determined that Savannah Berry, a sales agent of plaintiff under the supervision of defendant met with Janet Brooks to consider reinstating an old policy or writing a new policy. Brooks' husband, Elmer, was not present, but her son by a previous marriage, Johnny Armstrong, was present. Armstrong indicated that he wanted some insurance on his life, as well, and Berry agreed to return the next day, Tuesday, January 7th, for the purpose of meeting with Elmer and Janet Brooks, and Johnny Armstrong. The meeting did occur on that Tuesday, and some time in late afternoon, after 5:00 p.m., an application for the insurance for Mr. and Mrs. Brooks was executed and an additional application was executed by Armstrong for insurance on his life. Both Berry and the defendant signed affidavits stating that they were present on the occasion when the applications were signed.
Plaintiff's agent, Cornelius L. Brown, also a black and who has replaced defendant as a district manager, stated by affidavit that he was with defendant on January 7, 1986, between 3:00 and 7:00 p.m. for training purposes and at no time during this period did defendant leave Brown's presence.
The monthly premium for the $100,000 application was $44.55 and Berry stated that this sum was paid to her by Armstrong in cash at the time he signed the application. On Wednesday, January 8, 1986, Armstrong, age 21, died at approximately 5:45 a.m. in a fire and the death was determined to be accidental. Both defendant and Berry became aware of Armstrong's death sometime during that Wednesday.
It was not until Friday, January 10, 1986, that Berry submitted the application for the Armstrong policy and the $44.55 cash premium to plaintiff's servicing office for processing as new business. On that date, defendant as District Manager, received the application and premium from Berry and sent them, with an accompanying letter, to the home office of plaintiff for final processing. As the death of Armstrong was determined to be accidental, claim of the purported beneficiary has been made for the $100,000 face value shown on the application together with the $200,000 accidental death benefit or a total payment request of $300,000.
The Armstrong insurance application form was a printed folded form containing four pages. Page two was on the back of page one and page four was on the back of page three and all were folded together. Berry stated by affidavit that she filled out most of the form and also wrote in the $100,000 entry with the two commas. She stated that the entry was made all at one time and that Armstrong signed in her presence and in the presence of defendant.
The handwriting expert, who examined the application, stated that it was his belief that the application was prepared using two different pens, and at two different times. The last zero at the end of the $100,000 entry and the $200,000 entry for accidental death were completed with one pen, and at one time. The number "one" and the first four zeroes following that number on the purported $100,000 entry were made with a different pen and at a different time. Page one and the upper half of page three of the application appear to have been completed by the same pen, with remaining portions filled in with a different pen. The last zero and the comma after the second zero were inserted after the other entries on the application.
Both defendant and Berry deny any wrongdoing and Berry states that the first comma that she wrote on the application after the first zero was a mistake and when she realized the mistake, she added another comma after the second zero.
*722 Defendant was asked to submit voluntarily to a polygraph examination, but refused because he felt the exam might affect blood pressure and hypertension problems from which he suffered.
Defendant assisted the Armstrong family with the funeral arrangements but some of the statements he purportedly made to a funeral director were challenged by the funeral director as false.
Plaintiff concluded that these facts could very well indicate that the original application was executed by Armstrong with the application being partially complete and that it was completed in its present state after Armstrong's death.
Plaintiff's rules require agents to report to the district office on Tuesdays and Fridays to turn in collections of premiums and new applications. The rules also do not permit cash to be collected when the total amount of risk exceeds $250,000. One of the responsibilities of underwriting is to see that the amount of insurance applied for bears a reasonable relationship to the worth, income and needs of the proposed insured. Armstrong apparently had no assets and modest employment.
As a result of these findings and other minute facts not detailed here, plaintiff determined that district manager/defendant and agent Berry were not truthful in their representation of the facts surrounding the incident, and had violated company rules and policies. Accordingly, defendant was discharged as was Berry on the same date.
At the time of trial, Berry, defendant and Armstrong's mother and step-father testified. Berry and defendant denied any wrongdoing and some of their testimony was corroborated by Armstrong's mother and step-father. Armstrong's mother is the purported beneficiary on the application and the plaintiff in the separate suit to collect the insurance proceeds from the company. The basic testimony at trial was that defendant had accompanied Berry and all were present when the Armstrong application was signed. Berry filled out most of the application and Armstrong signed and handed her the cash for the premium.
Within a few weeks after plaintiff terminated defendant on May 14, 1986, defendant began his own independent insurance agency business as a sole proprietorship which eventually evolved to corporate status. In early June, 1986, defendant was appointed general agent for Guaranty Trust Life Insurance Company and began writing insurance for that company. Filings with the Missouri Division of Insurance by defendant revealed that during the period June 6, 1986, through June 30, 1986, 10 insurance sales agents were employed by defendant's agency and certified to sell for Guaranty Trust Life Insurance Company. These 10 agents were among the 16 sales agents of plaintiff immediately prior to defendant's termination.
All 10 of such agents testified and most indicated that they terminated their employment with plaintiff June 30, 1986, whereas the Division of Insurance listings show that the appointment dates of such agents by defendant preceded their termination by two or more weeks. All such agents began selling for defendant and for Guaranty Trust Life Insurance Company, a competitor of plaintiff.
At the time of trial, the six remaining agents of plaintiff continued to sell insurance for plaintiff and plaintiff was attempting to recruit new sales persons.
Each of the 10 agents who left plaintiff and joined defendant testified that they were motivated to do so solely on their own and requested to work for defendant without any inducement on defendant's part.
The temporary restraining order in this case was issued July 9, 1986, and it does not appear that there have been any violations of the order. There is ample evidence, however, to support sales by defendant and the 10 agents in the restricted area during the month of June, and the first eight days in July. There is evidence to support plaintiff's loss of business during the month of June and the first part of July and the loss of two-thirds of the sales staff make it obvious that the servicing of the customers that are the heart of plaintiff's business has been severely jeopardized. As there is no practical way to measure *723 loss of referrals or premiums that would have been paid due to the activities of agents servicing the policies, there is no specific evidence measuring precise damage suffered by plaintiff.
Although there is testimony that it is difficult for black insurance sales representatives to sell insurance to white customers and difficult for white insurance sales representatives to sell insurance to black customers, no specific evidence of discrimination appears here. Defendant and the 16 agents under his control as district manager were all black. Nearly all of their customers were black and the great majority of the residents within the area defined in the non-compete agreement were black. Accordingly, the Court finds no evidence of discrimination in this case and the issue now before the Court is whether to grant a preliminary injunction or dissolve the temporary restraining order. The Court determines that a preliminary injunction should issue.
The parties are citizens of different states and the matter in controversy exceeds the sum of $10,000.00 exclusive of interest and costs and the Court therefore, has subject matter jurisdiction pursuant to the diversity statutes, 28 U.S.C. § 1332(a)(1). As all of the acts complained of occurred in Missouri with the exception of certain mailings to plaintiff's home office in another state, Missouri law should govern the decision in this case.
In determining whether a preliminary injunction should issue, the Court should consider the threat of irreparable harm to the movant, the probability that movant will succeed on the merits, the balance between the harm to the movant if relief is denied and the harm to the defendant if an injunction is granted and the public interest. Data-Phase Systems, Inc. v. C.L. Systems, Inc., 640 F.2d 109 (8th Cir.1981).
Although plaintiff would have a legal remedy against defendant for damages each time the defendant sold a policy of insurance in violation of the non-compete agreement, the impracticality of this procedure is obvious. Such a remedy is inadequate. It is equally obvious, therefore, that plaintiff will suffer irreparable harm if not restrained as defendant and two-thirds of plaintiff's sales force stand ready to and have competed with plaintiff and the remainder of its staff in the non-compete area. Under these circumstances, it is unnecessary for plaintiff employer to show that actual damage has occurred as a first requisite for obtaining an injunction. Osage Glass, Inc. v. Donovan, 693 S.W.2d 71, 75 (Mo banc, 1985), Long v. Huffman, 557 S.W.2d 911, (Mo.App.1977), Reed, Roberts Associates, Inc. v. Bailenson, 537 S.W.2d 238, 242 (Mo.App.1976).
Although this decision involves temporary injunctive relief only, the Court acknowledges that granting that relief is tantamount to a decision on the merits as it will be difficult to hear the case at a later time on the merits and reach a final conclusion before the non-compete year ends. Nevertheless, without making a final determination on the merits, this Court concludes that there is a probability that plaintiff will succeed on the merits thereby satisfying the second Data-Phase requirement.
Plaintiff, as the employer of defendant, has the right to terminate him and still enforce a non-compete agreement. City Ice and Fuel Co. v. Snell, 57 S.W.2d 440 (Mo.App.1933), City Ice and Fuel Co. v. McKee, 57 S.W.2d 443 (Mo.App.1933), Farmers Underwriters Assn. v. Reid, 425 S.W.2d 247 (Mo.App.1967).
The employment contract between plaintiff and defendant is terminable at will by either party "without cause and without notice". This language would indicate plaintiff could terminate defendant even in bad faith. Nevertheless, equity and fair play might suggest that a good faith termination is warranted if an employer intends to enforce a non-compete agreement against the terminated employee. Buysse v. Paine, Webber, Jackson and Curtis, Inc., 623 F.2d 1244, 1249 (8th Cir.1980), Rao v. Rao, 718 F.2d 219, 222-225 (7th Cir.1983).
This Court cannot say as a matter of law that plaintiff acted in bad faith *724 when it discharged defendant and then attempted to enforce a non-compete agreement.
The Johnny Armstrong episode could have created sufficient cause for the termination of defendant and agent Berry. At the time, plaintiff felt defendant and Berry had been untruthful and had violated company policy. The events surrounding the execution of the application for the insurance and its processing are indeed suspect. The amount of insurance written in as $10,0,000 is highly questionable. Both defendant and Berry were aware that this ambiguous application was apparently signed on a Tuesday and the insured, died the next day. Under these circumstances, even though applications were to be processed on Tuesdays and Fridays, an agent and a district manager surely would have processed the application immediately rather than wait until the following Friday, two days later. This conduct is even more suspect when another agent states defendant was with him when the Armstrong policy was signed so that defendant could not have witnessed the Armstrong signature, and when a mortician avers defendant falsified information concerning the insured's death, and when a handwriting expert believes the blank spaces in the application were filled in at different times and with different pens.
Defendant and Berry were aware of company policy that prohibited the receipt of cash for premiums for insurance in excess of $250,000.00, and in considering the writing of policies in substantial sums which bear no reasonable relationship to the worth, income and needs of an insured, and nevertheless violated them.
The discharge of an employee, even a valued district manager under these circumstances, does not constitute bad faith nor is it necessarily without cause.
The non-compete period of one year and the area constituting a portion of St. Louis city in which defendant is restricted from insurance sales do not constitute unreasonable limitations. Osage Glass, Inc. v. Donovan, 693 S.W.2d 71 (Mo.banc 1985), (approval of a three-year restriction); City Ice and Fuel Company v. Snell and McKee, supra, (approval of a one-year restriction); Farmers Underwriters Association v. Reid, 425 S.W.2d 247 (Mo.App. 1967), (approval of a one-year restriction in an area which comprised the former agent's district); Thompson et al. v. Allain, 377 S.W.2d 465 (Mo.App.1964), (approval of a three-year restriction within a 50-mile radius); Orchard Container Corp. v. Orchard, 601 S.W.2d 299, 303, 304 (Mo. App.1980), (200-mile radius restriction reduced to a 125-mile radius by the Court).
If plaintiff-employer first breached the agreement with defendant-employee and then terminated the employment agreement and thereafter sought to enforce the non-compete agreement, plaintiff would be precluded from enforcing the restrictive covenant in issue. Forms Mfg., Inc. v. Edwards, 705 S.W.2d 67, 69 (Mo.App.1985). There is no reliable evidence though on which it can be found that plaintiff breached the employment agreement and then terminated defendant. Accordingly, it would appear there is a probability plaintiff may succeed on the merits.
The Court has also weighed the harm to the movant if relief is denied and the harm to defendant if the temporary injunction is granted, and the public interest, and determines these considerations do not preclude the granting of temporary relief.
Defendant will be precluded from selling insurance for a year in a limited area. He can still sell outside the area now and in the area after one year. There are many black potential insurance customers outside the prohibited area who may be solicited by defendant and his agents. Neither plaintiff nor the public are unduly prejudiced, therefore, by a preliminary injunction.

PRELIMINARY INJUNCTION
IT IS HEREBY ORDERED that plaintiff's motion for preliminary injunction is SUSTAINED and defendant and all persons and entities in concert or participation with him, are hereby restrained and enjoined from directly or indirectly within the *725 geographic boundaries of plaintiff's St. Louis district as defined in Exhibit A:
(a) soliciting, selling or attempting to solicit or sell any form of life, health, annuities and/or accident insurance within the geographic boundaries of plaintiff's St. Louis District;
(b) contacting any company policyholder for the purpose of inducing or attempting to induce such policyholder to cancel, lapse or fail to renew such policyholder's policy with the plaintiff;
(c) inducing or attempting to induce any of the plaintiff's clerical force, agents, staff members, district managers or other employees to terminate their employment with the plaintiff or to sell life, health, annuities or accident insurance with any other company;
(d) retaining in his possession any of plaintiff's records, supplies, materials and forms (or any copy thereof) including but limited to loan forms, cash surrender forms, requests for duplicate punch card forms, modification forms, change of beneficiary forms, Form 884 (Debit Route Order of Weekly and MDO policies), or any page or pages from the Agent's Service book.
IT IS FURTHER ORDERED that this preliminary injunction shall continue until dissolved, or a permanent injunction is ordered or until May 14, 1987, whichever occurs first.

EXHIBIT A

Plaintiff's St. Louis District
The district encompasses an area having boundaries beginning at Hamilton extended and Lindell; thence northerly on Hamilton to Page; thence easterly on Page to Union; thence northerly on Union to West Florissant; thence southeasterly on West Florissant to Interstate 70; thence southeasterly on 1-70 to Tucker extended; thence southerly on Tucker to Interstate 44; thence westerly on Interstate 44 to Kingshighway; thence northerly on Kingshighway to Lindell and thence westerly on Lindell to Hamilton extended.

MEMORANDUM OPINION, PERMANENT INJUNCTION AND ORDER
This matter is pending on a request for a permanent injunction and damages. Preliminary injunction was issued October 17, 1986, and hearing on the merits was had February 10, 1987 and again on February 27, 1987. The preliminary injunction should be made permanent.
The finding of facts set out in the preliminary injunction will be adopted and not restated here. Although objection was made by defendant as to certain hearsay evidence of handwriting experts elicited at the preliminary hearing and not clarified at the recent hearings, these objections will be overruled. The evidence was neither introduced by plaintiff nor received by the Court for the truth of the statements, but was set out for the purpose of showing the reliance by plaintiff on the accuracy of the utterences.
The additional testimony and documentary evidence elicited at the February hearings were of insufficient moment to alter the Court's original findings. This Court cannot conclude that plaintiff acted in bad faith in terminating defendant's employment on the basis of its finding that defendant was not truthful in his representation of the facts surrounding the Armstrong incident and that defendant had violated company rules and policies. Plaintiff had the right, therefore, to terminate defendant and to enforce the non-compete agreement until May 14, 1987. The one-year time restriction and the area of restrictions do not constitute unreasonable limitations.
On the basis of the testimony at all hearings, the Court is convinced that defendant, an undisputed excellent insurance salesman, and fine sales and employee motivator, could have caused substantial harm to plaintiff had defendant not been enjoined for one year in selling insurance to plaintiff's customers in the St. Louis District area.
Ten of plaintiff's 16 sales agents left plaintiff's employ within weeks after defendant was terminated and joined defendant's new insurance agency. This formidable *726 group, unrestrained, could have appropriated many of plaintiff's customers.
Nevertheless, the Court is unable to determine from the evidence that the total loss of business plaintiff claims it suffered is directly related to any wrongdoing of defendant. Plaintiff may therefore recover from defendant the sum of One Hundred and no/100 Dollars ($100.00) actual damages because of defendant's breach of the employment agreement entered into with plaintiff, and no punitive damages.
IT IS THEREFORE ORDERED that plaintiff have judgment against defendant for One Hundred and no/100 Dollars ($100.00) and that the preliminary injunction of October 17, 1986 be made permanent until May 14, 1987 whereupon it shall be dissolved. Costs shall be awarded to plaintiff.