**Glenna HOPPER, D.V.M., Appellant (Defendant),**

v.

**ALL PET ANIMAL CLINIC, INC., a Wyoming corporation; and Alpine Animal Hospital, Inc., a Wyoming corporation, Appellees (Plaintiffs).**

**ALL PET ANIMAL CLINIC, INC., a Wyoming corporation; and Alpine Animal Hospital, Inc., a Wyoming corporation, Appellants (Plaintiffs),**

v.

**Glenna HOPPER, D.V.M., Appellee (Defendant).**

Nos. 92–254, 92–255.

Supreme Court of Wyoming.

Oct. 1, 1993.

covenant imposed reasonable geographic and durational limits necessary to protect the employers' businesses and enjoined a veterinarian from practicing small animal medicine for three years within a five mile radius of the city limits of Laramie, Wyoming. The district court denied a damage claim for breach of the employment agreement brought by the veterinarian's two corporate employers because it was speculative. The veterinarian appeals from the decision to enforce the terms of the covenant. In the companion case, the corporate employers appeal the decision to deny damages.

We hold that the covenant's three year duration imposed an unreasonable restraint of trade permitting only partial enforcement of a portion of that term of the covenant. We affirm the district court's conclusions of law that the remaining terms of the covenant were reasonable. We also affirm the district court's judgment refusing damages because the finding that damages were unproven is not clearly erroneous.

## I. ISSUES

In Case No. 92–254, appellant, the veterinarian, frames the following issues:

A. The trial court abused its discretion in failing to consider the undue hardship to the appellant in granting the injunction.

B. The trial court abused its discretion in granting the injunction as appellees failed to prove the existence of irreparable harm.

C. The trial court abused its discretion in granting the injunction as the restrictive covenant was overbroad.

Appellees, the corporate employers, rephrase the issues:

A. Whether the evidence is sufficient to sustain the district court's finding that enforcement of the covenant not to compete would not cause appellant to suffer undue hardship[.]

B. Whether the evidence is sufficient to sustain the district court's finding that

Kennard F. Nelson of Kirkwood & Nelson, Laramie, for Glenna Hopper, D.V.M.

Patricia L. Simpson and C.M. Aron of Aron, Hennig & Simpson, Laramie, for All Pet Animal Clinic, Inc. and Alpine Animal Hosp., Inc.

Before MACY, C.J., and THOMAS, CARDINE, GOLDEN and TAYLOR, JJ.

TAYLOR, Justice.

These consolidated appeals test the enforceability of a covenant not to compete which was included in an employment contract. The district court found that the

appellees suffered irreparable injury as a result of appellant's breach of the covenant not to compete[.]

C. Whether the covenant not to compete in question here is reasonable[.]

In Case No. 92–255, appellants, the corporate employers, question:

I. Whether the court's finding that the amount of damages suffered by appellants is speculative and was not proven by appellants by a preponderance of the evidence is contrary to the evidence[.]

The veterinarian responds:

Did the trial court err in finding that the amount of damages claimed by Appellants was speculative and not proven by a preponderance of the evidence?

## II. FACTS

Following her graduation from Colorado State University, Dr. Glenna Hopper (Dr. Hopper) began working part-time as a veterinarian at the All Pet Animal Clinic, Inc. (All Pet) in July of 1988. All Pet specialized in the care of small animals; mostly domesticated dogs and cats, and those exotic animals maintained as household pets. Dr. Hopper practiced under the guidance and direction of the President of All Pet, Dr. Robert Bruce Johnson (Dr. Johnson).

Dr. Johnson, on behalf of All Pet, offered Dr. Hopper full-time employment in February of 1989. The oral offer included a specified salary and potential for bonus earnings as well as other terms of employment. According to Dr. Johnson, he conditioned the offer on Dr. Hopper's acceptance of a covenant not to compete, the specific details of which were not discussed at the time. Dr. Hopper commenced full-time employment with All Pet under the oral agreement in March of 1989 and relocated to Laramie, discontinuing her commute from her former residence in Colorado.

A written Employment Agreement incorporating the terms of the oral agreement was finally executed by the parties on December 11, 1989. Ancillary to the provisions for employment, the agreement detailed the terms of a covenant not to compete:

12. This agreement may be terminated by either party upon 30 days' notice to the other party. Upon termination, Dr. Hopper agrees that she will not practice small animal medicine for a period of three years from the date of termination within 5 miles of the corporate limits of the City of Laramie, Wyoming. Dr. Hopper agrees that the duration and geographic scope of that limitation is reasonable.

The agreement was antedated to be effective to March 3, 1989.

The parties executed an Addendum To Agreement on June 1, 1990. The addendum provided that All Pet and a newly acquired corporate entity, Alpine Animal Hospital, Inc. (Alpine), also located in Laramie, would share in Dr. Hopper's professional services. As the President of All Pet and Alpine, Dr. Johnson agreed, in the addendum, to raise Dr. Hopper's salary. The bonus provision of the original agreement was eliminated. Except as modified, the other terms of the March 3, 1989 employment agreement, including the covenant not to compete, were reaffirmed and Dr. Hopper continued her employment.

One year later, reacting to a rumor that Dr. Hopper was investigating the purchase of a veterinary practice in Laramie, Dr. Johnson asked his attorney to prepare a letter which was presented to Dr. Hopper. The letter, dated June 17, 1991, stated:

I have learned that you are considering leaving us to take over the small animal part of Dr. Meeboer's practice in Laramie.

When we negotiated the terms of your employment, we agreed that you could leave upon 30 days' notice, but that you would not practice small animal medicine within five miles of Laramie for a three-year period. We do not have any non-competition agreement for large-animal medicine, which therefore does not enter into the picture.

I am willing to release you from the non-competition agreement in return for a cash buy-out. I have worked back from the proportion of the income of All–

Pet and Alpine which you contribute and have decided that a reasonable figure would be $40,000.00, to compensate the practice for the loss of business which will happen if you practice small-animal medicine elsewhere in Laramie.

If you are willing to approach the problem in the way I suggest, please let me know and I will have the appropriate paperwork taken care of.

Sincerely,

[Signed]

R. Bruce Johnson, D.V.M.

Dr. Hopper responded to the letter by denying that she was going to purchase Dr. Meeboer's practice. Dr. Hopper told Dr. Johnson that the Employment Agreement was not worth the paper it was written on and that she could do anything she wanted to do. Dr. Johnson terminated Dr. Hopper's employment and informed her to consider the 30–day notice as having been given. An unsigned, handwritten note from Dr. Johnson to Dr. Hopper, dated June 18, 1991, affirmed the termination and notice providing, in part:

Per your request to abide by your employment agreement with All Pet and Alpine as regards termination:

Be advised that your last day of employment is July 18, 1991 for reasons that we are both aware of and have discussed previously.

Subsequently, Dr. Hopper purchased Gem City Veterinary Clinic (Gem City), the practice of Dr. Melanie Manning. Beginning on July 15, 1991, Dr. Hopper operated Gem City, in violation of the covenant not to compete, within the City of Laramie and with a practice including large and small animals. Under Dr. Hopper's guidance, Gem City's client list grew from 368 at the time she purchased the practice to approximately 950 at the time of trial. A comparison of client lists disclosed that 187 clients served by Dr. Hopper at Gem City were also clients of All Pet or Alpine. Some of these shared clients received permissible large animal services from Dr. Hopper. Overall, the small animal work contributed

from fifty-one to fifty-two percent of Dr. Hopper's gross income at Gem City.

All Pet and Alpine filed a complaint against Dr. Hopper on November 15, 1991 seeking injunctive relief and damages for breach of the covenant not to compete contained in the Employment Agreement. Notably, All Pet and Alpine did not seek a temporary injunction to restrict Dr. Hopper's practice and possibly mitigate damages during the pendency of the proceeding. Trial was conducted on September 28, 1992.

The district court, in its Findings of Fact, Conclusions of Law and Judgment, determined that the covenant not to compete was enforceable as a matter of law and contained reasonable durational and geographic limits necessary to protect All Pet's and Alpine's special interests. The special interests found by the district court included: special influence over and direct contact with All Pet's and Alpine's clients; access to client files; access to pricing policies; and instruction in practice development. Dr. Hopper was enjoined from practicing small animal medicine within five miles of the corporate limits of the City of Laramie for a period of three years from July 18, 1991. The district court found that the amount of damages suffered by All Pet and Alpine was speculative and not proven by a preponderance of the evidence.

## III. STANDARD OF REVIEW

A trial of this case was before the court. By request of one of the parties, specific findings of fact and conclusions of law were stated under W.R.C.P. 52(a) (hereinafter Rule 52(a)). Rule 52(a) states:

General and special findings by court.— Upon the trial of questions of fact by the court, or with an advisory jury, it shall not be necessary for the court to state its findings, except generally for the plaintiff or defendant, unless one of the parties requests it before the introduction of any evidence, with the view of excepting to the decision of the court upon the questions of law involved in the trial, in which case the court shall state in writing its special findings of fact separately

from its conclusions of law; provided, that without such request the court may make such special findings of fact and conclusions of law as it deems proper and if the same are preserved in the record either by stenographic report or by the court's written memorandum, the same may be considered on appeal. Requests for findings are not necessary for purposes of review. The findings of a master, to the extent that the court adopts them, shall be considered as the findings of the court. Findings of fact and conclusions of law are unnecessary on decisions of motions under Rules 12 or 56 or any other motion except as provided in subdivision (c) of this rule.

While the specific language of Rule 52(a) differs from its federal counterpart, F.R.C.P. 52(a), in part because current federal rules require findings of fact and conclusions of law in all cases of trial to the court without a request of parties, this court has adopted the view that the similarity in language and purpose of the state and federal rules permits resort to federal precedent for aid in effectuating the intent of Rule 52(a). *Whitefoot v. Hanover Ins. Co.*, 561 P.2d 717, 720 (Wyo.1977).

■ Unfortunately, on appeal, the parties have misconstrued the appropriate standard of review relevant to such findings and conclusions. We believe this confusion results from a misapplication of principles of review utilized for jury verdicts and administrative law with those related to facts found by the court. The factual findings of a judge are not entitled to the more limited review afforded a jury verdict. 9 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure: Civil*, § 2585 at 730 (1971).

■ The purpose of specific findings under Rule 52(a) is to inform the appellate court of the underlying facts supporting the trial court's conclusions of law and disposition of the issues. *Lebsack v. Town of Torrington*, 698 P.2d 1141, 1146 (Wyo. 1985); *Cline v. Sawyer*, 600 P.2d 725, 730 (Wyo.1979); *Whitefoot*, 561 P.2d at 720. While the findings are presumptively correct, the appellate court may examine all of the properly admissible evidence in the record. *Shores v. Lindsey*, 591 P.2d 895, 899 (Wyo.1979); 9 Wright & Miller, *supra*, § 2585 at 729, 731. Deference is given to the opportunity of the trial court to assess the credibility of the witnesses. *Shores*, 591 P.2d at 899. Because this court does not weigh the evidence *de novo*, findings may not be set aside because we would have reached a different result. *Shores*, 591 P.2d at 899; 9 Wright & Miller, *supra*, § 2585 at 732–33. The appellant bears the burden of persuading the appellate court that the finding is erroneous. 9 Wright & Miller, *supra*, § 2585 at 729.

■ On appeal, findings of fact are not set aside unless clearly erroneous. *Shores*, 591 P.2d at 899; *Whitefoot*, 561 P.2d at 720; 9 Wright & Miller, *supra*, § 2585 at 729. The definitive test of when a finding is clearly erroneous was adopted by the United States Supreme Court in *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id.* at 395, 68 S.Ct. at 542. *See Citibank, N.A. v. Wells Fargo Asia Ltd.*, 495 U.S. 660, 670, 110 S.Ct. 2034, 2041, 109 L.Ed.2d 677 (1990), *cert. denied*, —— U.S. ——, 112 S.Ct. 2990, 120 L.Ed.2d 868 (1992) (reaffirming the *United States Gypsum Co.* test). Wyoming accepted this standard for Rule 52(a) in *Shores*, 591 P.2d at 899. Alternatively, a determination that a finding is against the great weight of the evidence means a finding will be set aside even if supported by substantial evidence. *Rocky Mountain Turbines, Inc. v. 660 Syndicate, Inc.*, 623 P.2d 758, 762 (Wyo.1981); *Shores*, 591 P.2d at 899; 9 Wright & Miller, *supra*, § 2585 at 735 n. 10.

■ Conclusions of law made by the district court under Rule 52(a) are not binding upon this court and are reviewed *de novo*. *Shores*, 591 P.2d at 900; 9 Wright & Miller, *supra*, § 2588 at 752. "Findings of fact of

the trial judge can also lose the insulation of the clearly erroneous standard if they are induced by an erroneous view of the law, *United States v. United States Gypsum Co.,* * * * 333 U.S. at 394, 68 S.Ct. at 541; and *United States v. Richberg,* * * * 398 F.2d 523 ([5th Cir.] 1968), or contain factual and legal conclusions that reflect the application of an improper legal standard." *Shores,* 591 P.2d at 899–900.

## IV. DISCUSSION

### A. The Enforceability of a Covenant Not to Compete

■■■■■ The common law policy against contracts in restraint of trade is one of the oldest and most firmly established. Restatement (Second) of Contracts §§ 185–188 (1981) (Introductory Note at 35). *See Dutch Maid Bakeries v. Schleicher,* 58 Wyo. 374, 131 P.2d 630, 634 (1942). The traditional disfavor of such restraints means covenants not to compete are construed against the party seeking to enforce them. *Commercial Bankers Life Ins. Co. of America v. Smith,* 516 N.E.2d 110, 112 (Ind.App.1987). The initial burden is on the employer to prove the covenant is reasonable and has a fair relation to, and is necessary for, the business interests for which protection is sought. *Tench v. Weaver,* 374 P.2d 27, 29 (Wyo.1962).

■■■■■ Two principles, the freedom to contract and the freedom to work, conflict when courts test the enforceability of covenants not to compete. *Ridley v. Krout,* 63 Wyo. 252, 180 P.2d 124, 128 (1947). There is general recognition that while an employer may seek protection from improper and unfair competition of a former employee, the employer is not entitled to protection against ordinary competition. *See, e.g., Duffner v. Alberty,* 19 Ark.App. 137, 718 S.W.2d 111, 112 (1986) and *American Sec. Services, Inc. v. Vodra,* 222 Neb. 480, 385 N.W.2d 73, 78 (1986). The enforceability of a covenant not to compete depends upon a finding that the proper balance exists between the competing interests of the employer and the employee. *See* Restatement (Second) of Agency § 393 cmt. e

(1958) (noting that without a covenant not to compete, an agent, employee, can compete with a principal despite past employment and can begin preparations for future competition, such as purchasing a competitive business, before leaving present employment).

Wyoming adopted a rule of reason inquiry from the Restatement of Contracts testing the validity of a covenant not to compete. *Dutch Maid Bakeries,* 131 P.2d at 634 (citing Restatement of Contracts §§ 513–515 (1932)); *Ridley,* 180 P.2d at 127. The present formulation of the rule of reason is contained in Restatement (Second) of Contracts, *supra,* § 188:

(1) A promise to refrain from competition that imposes a restraint that is ancillary to an otherwise valid transaction or relationship is unreasonably in restraint of trade if

 (a) the restraint is greater than is needed to protect the promisee's legitimate interest, or

 (b) the promisee's need is outweighed by the hardship to the promisor and the likely injury to the public.

(2) Promises imposing restraints that are ancillary to a valid transaction or relationship include the following:

 (a) a promise by the seller of a business not to compete with the buyer in such a way as to injure the value of the business sold;

 (b) a promise by an employee or other agent not to compete with his employer or other principal;

 (c) a promise by a partner not to compete with the partnership.

*See also* Restatement (Second) of Contracts, *supra,* §§ 186–187. An often quoted reformulation of the rule of reason inquiry states that "[a] restraint is reasonable only if it (1) is no greater than is required for the protection of the employer, (2) does not impose undue hardship on the employee, and (3) is not injurious to the public." Harlan M. Blake, *Employee Agreements Not to Compete,* 73 Harv. L.Rev. 625, 648–49 (1960).

■ A valid and enforceable covenant not to compete requires a showing that the covenant is: (1) in writing; (2) part of a contract of employment; (3) based on reasonable consideration; (4) reasonable in durational and geographical limitations; and (5) not against public policy. *A.E.P. Industries, Inc. v. McClure,* 308 N.C. 393, 302 S.E.2d 754, 760 (1983). *See Tench,* 374 P.2d at 29; *Ridley,* 180 P.2d at 128; *Dutch Maid Bakeries,* 131 P.2d at 634; and Wyo. Stat. § 1–23–105 (1988). The reasonableness of a covenant not to compete is assessed based upon the facts of the particular case and a review of all of the circumstances. *American Sec. Services, Inc.,* 385 N.W.2d at 79.

■ While many factors may be considered by the court in evaluating reasonableness as a matter of law, a useful enumeration is contained in *Philip G. Johnson & Co. v. Salmen,* 211 Neb. 123, 317 N.W.2d 900, 904 (1982):

> The considerations to be balanced are the degree of inequality in bargaining power; the risk of the covenantee losing customers; the extent of respective participation by the parties in securing and retaining customers; the good faith of the covenantee; the existence of sources or general knowledge pertaining to the identity of customers; the nature and extent of the business position held by the covenantor; the covenantor's training, health, education, and needs of his family; the current conditions of employment; the necessity of the covenantor changing his calling or residence; and the correspondence of the restraint with the need for protecting the legitimate interests of the covenantee.

Wyoming has previously recognized that the legitimate interests of the employer, covenantee, which may be protected from competition include: (a) the employer's trade secrets which have been communicated to the employee during the course of employment; (b) confidential information communicated by the employer to the employee, but not involving trade secrets, such as information on a unique business method; and (c) special influence by the employee obtained during the course of employment over the employer's customers. *Ridley,* 180 P.2d at 129.

■ The enforceability of a covenant not to compete using the rule of reason analysis depends upon a determination, as a matter of law, that the promise not to compete is ancillary to the existence of an otherwise valid transaction or relationship. Restatement (Second) of Contracts, *supra,* § 187. If, for example, the contract of employment containing the covenant not to compete fails for lack of consideration, adhesion or other contractual excuse, the covenant is without effect. *Reddy v. Community Health Foundation of Man,* 171 W.Va. 368, 298 S.E.2d 906, 915 (1982). The covenant is also without effect because it is not ancillary when it is made in a promise subsequent to the transaction or relationship. Restatement (Second) Contracts, *supra,* § 187 cmt. b.

■ When Dr. Johnson made the oral promise of employment to Dr. Hopper, the specific terms of the covenant were not discussed. Dr. Johnson testified that no terms for a geographic radius or time restriction on competition were stated during formation of the oral contract of employment. Without terms and without a writing, Wyo.Stat. § 1–23–105, a promise not to compete at this time failed as ancillary to the creation of the relationship.

The written Employment Agreement Dr. Hopper signed does contain a covenant not to compete which is ancillary to the previously agreed provisions for employment memorialized from the oral contract. Restatement (Second) of Contracts, *supra,* § 187 cmt. b recognizes that in an ongoing transaction or relationship, a promise not to compete may be made before the termination of the relationship and still be ancillary *as long as it is supported by consideration* and meets other requirements for enforceability. It is necessary to analyze whether Dr. Hopper's promise not to compete, made after the creation of the relationship while executing the written Employment Agreement, was supported by consideration.

Wyoming has never determined whether a promise not to compete made during the employment relationship is supported merely by the consideration of continued employment or must be supported by separate contemporaneous consideration. This court's decision in *Ridley* offers useful insight. An employment relationship with a mechanic was formed prior to the execution of the written contract containing the employee's ancillary promise not to compete. *Ridley*, 180 P.2d at 125. While we did not specifically address the sufficiency of the consideration, the written contract with the mechanic contained separate consideration. In addition to the promise to continue employment for a term of ten years, the employer agreed, as consideration for the promise not to compete, to teach the mechanic new skills as a locksmith and in business operation. *Id.* at 125–26.

Authorities from other jurisdictions are not in agreement on whether continued employment provides sufficient consideration or whether separate consideration is required to create an ancillary covenant not to compete made during the existence of the relationship. *See* Howard A. Specter & Matthew W. Finkin, *Individual Employment Law and Litigation* § 8.02 (1989) (collecting cases). We believe strong public policy favors separate consideration.

> The better view, even in the at-will relationship, is to require additional consideration to support a restrictive covenant entered into during the term of the employment. This view recognizes the increasing criticism of the at-will relationship, the usually unequal bargaining power of the parties, and the reality that the employee rarely "bargains for" continued employment in exchange for a potentially onerous restraint on the ability to earn a living.

*Id.*, § 8.02 at 450. The separate consideration necessary to support an ancillary promise not to compete made after creation of the employment relationship would include promotion, pay raise, special training, employment benefits or other advantages for the employee. *Ridley*, 180 P.2d at 125–

26; *Stevenson v. Parsons*, 96 N.C.App. 93, 384 S.E.2d 291, 293 (1989); *Records Center, Inc. v. Comprehensive Management, Inc.*, 363 Pa.Super. 79, 525 A.2d 433, 435 (1987); *Cukjati v. Burkett*, 772 S.W.2d 215, 218 (Tex.App.1989). *See* Or.Rev.Stat. § 653.295 (1991) (requiring bona fide advancement of the employee to enforce a covenant not to compete entered into after creation of the employment relationship).

The written Employment Agreement Dr. Hopper signed contains no evidence of separate consideration, such as a pay raise or other benefit, in exchange for the covenant not to compete. Standing alone, the covenant not to compete contained in the Employment Agreement failed due to lack of separate consideration. Restatement (Second) of Contracts, *supra*, § 187. However, on June 1, 1990, the parties executed the Addendum to Agreement. In that agreement, Dr. Hopper accepted a pay raise of $550.00 per month. This agreement restates, by incorporation, the terms of the covenant not to compete. We hold that the Addendum to Agreement, with its pay raise, represented sufficient separate consideration supporting the reaffirmation of the covenant not to compete. Therefore, the district court's findings that the covenant was ancillary to an employment contract and that consideration was received in exchange for the covenant are not clearly erroneous.

The contract permitted either Dr. Hopper or her corporate employers to terminate her employment with notice. The agreement did not state a length of employment and it permitted termination at will. Without more, the terms present the potential for an unreasonable restraint of trade. For example, if an employer hired an employee at will, obtained a covenant not to compete, and then terminated the employee, without cause, to arbitrarily restrict competition, we believe such conduct would constitute bad faith. Simple justice requires that a termination by the employer of an at will employee be *in good faith* if a covenant not to compete is to be enforced. *Dutch Maid Bakeries*, 131 P.2d at 635–36; *American Nat. Ins. Co. v. Coe*,

657 F.Supp. 718, 723 (E.D.Mo.1986). *See Adrian N. Baker & Co. v. Demartino*, 733 S.W.2d 14, 18 (Mo.App.1987) (enforcing covenant not to compete when discharge of employee occurred with good cause).

Under the present facts, we cannot say that the termination of Dr. Hopper occurred in bad faith. Trial testimony presented evidence of increasing tension prior to termination in the professional relationship between Dr. Johnson and Dr. Hopper. This tension, however, did not appear to result in the termination. The notice of termination was given after Dr. Hopper was confronted about her negotiations to purchase a competitive practice and after Dr. Hopper had termed the employment contract worthless. We cannot find in these facts a bad faith termination which would provide a reason to depart from the district court's finding that the contract of employment was valid. With the determination that as a matter of law the covenant is ancillary to a valid employment relationship, we turn to the rule of reason inquiry.

Employers are entitled to protect their business from the detrimental impact of competition by employees who, but for their employment, would not have had the ability to gain a special influence over clients or customers. *Ridley*, 180 P.2d at 131. *Beckman v. Cox Broadcasting Corp.*, 250 Ga. 127, 296 S.E.2d 566 (1982) illustrates the principle in the broadcast industry where the clients are the viewers of a particular station. Beckman was a television weather forecaster whose contributions to the "Action News Team" had been extensively promoted by Cox during his employment. *Id.* at 567. The promotion and Beckman's personality succeeded in attracting viewers to watch the television station. When his contract with Cox expired, Beckman accepted employment with a competitive television station in the same city and sought a declaratory judgment to determine the validity of a restrictive covenant which prevented him from appearing on television for six months within a radius of thirty-five miles of Cox's station offices. *Id.*

The Supreme Court of Georgia agreed that Beckman was entitled to take to a new employer his assets as an employee which he had contributed to his former employer. *Id.* at 569. "It is true that an employee's aptitude, skill, dexterity, manual and mental ability and other subjective knowledge obtained in the course of employment are not property of the employer which the employer can, in absence of a contractual right, prohibit the employee from taking with him at the termination of employment." *Id.* The covenant permitted Cox to recover from the loss of Beckman's services by implementing a transition plan while still permitting Beckman to work as a meteorologist, but not to the extent of appearing on air with a competitive television station. *Id.* The *Beckman* court determined that the business interests of Cox required protection which enforcement of the reasonable terms of the covenant provided. *Id.*

The special interests of All Pet and Alpine identified by the district court as findings of fact are not clearly erroneous. Dr. Hopper moved to Laramie upon completion of her degree prior to any significant professional contact with the community. Her introduction to All Pet's and Alpine's clients, client files, pricing policies, and practice development techniques provided information which exceeded the skills she brought to her employment. While she was a licensed and trained veterinarian when she accepted employment, the additional exposure to clients and knowledge of clinic operations her employers shared with her had a monetary value for which the employers are entitled to reasonable protection from irreparable harm. *See Reddy*, 298 S.E.2d at 912–14 (discussing the economic analysis applied to restrictive covenants). The proven loss of 187 of All Pet's and Alpine's clients to Dr. Hopper's new practice sufficiently demonstrated actual harm from unfair competition.

The reasonableness, in a given fact situation, of the limitations placed on a former employee by a covenant not to compete are determinations made by the court as a matter of law. *See, e.g., Jarrett v.*

*Hamilton,* 179 Ga.App. 422, 346 S.E.2d 875, 876 (1986). Therefore, the district court's conclusions of law about the reasonableness of the type of activity, geographic, and durational limits contained in the covenant are subject to *de novo* review.

■ All parties to this litigation devoted extensive research to evaluations of the reasonableness of various covenants not to compete from different authorities. However, we find precedent from our own or from other jurisdictions to be of limited value in considering the reasonableness of limits contained in a specific covenant not to compete. *See* Specter & Finkin, *supra,* § 8.03 at 454–55. For example, in *Cukjati,* 772 S.W.2d at 216, 218, the Court of Appeals of Texas held a covenant not to compete was unreasonable because it limited a veterinarian from practicing within twelve miles of his former employer's clinic in North Irving, a community within the Dallas–Fort Worth metropolitan area. Because evidence from that proceeding disclosed that Dallas area residents are unlikely to travel more than a few miles for pet care, the court found the restriction unreasonable. *Id.* at 218. The number of veterinarians and the demands upon their services obviously varies between Laramie, Wyoming and metropolitan Dallas, Texas, creating a different usage pattern. We believe the reasonableness of individual limitations contained in a specific covenant not to compete must be assessed based upon the facts of that proceeding. *Ridley,* 180 P.2d at 131.

Useful legal principles do emerge from a survey of relevant authorities and may certainly be applied to decisions about the reasonableness of the type of activity, geographic, and durational limitations. Testing the reasonableness of the type of activity limitation provides an opportunity for the court to consider the broader public policy implications of a covenant not to compete. *Tench,* 374 P.2d at 29. The decision of the Court of Appeals of Ohio in *Williams v. Hobbs,* 9 Ohio App.3d 331, 9 OBR 599, 460 N.E.2d 287 (1983) explains. The *Williams* court determined that enforcing a covenant not to compete restrict-

ing a radiologist's uncommon specialty practice would violate public policy because the community would be deprived of a unique skill. *Id.* at 290. In addition, the court held the type of activity limitation was unreasonable because it created an undue hardship on the physician where there were only a limited number of osteopathic hospitals available to practice his specialty. *Id.*

The Court of Appeals of Arkansas, in an en banc opinion, used a similar analysis in reviewing a covenant not to compete which restricted an orthopedic surgeon from practicing medicine within a radius of thirty miles from the offices of his former partners. *Duffner,* 718 S.W.2d at 113–14. The court held that the covenant interfered with the public's right to choose an orthopedic surgeon and that enforcement of the covenant created an unreasonable restraint of trade. *Id.* at 114. In determining that no business interests of the partnership were lost, the court noted that while the surgeon provided normal post-operative care for those patients he had operated on while associated with the partnership, he had not "appropriated" any of the partnership's "stock of patients" when he moved to another office. *Id.*

■ Enforcement of the practice restrictions Dr. Hopper accepted as part of her covenant not to compete does not create an unreasonable restraint of trade. While the specific terms of the covenant failed to define the practice of small animal medicine, the parties' trade usage provided a conforming standard of domesticated dogs and cats along with exotic animals maintained as household pets. As a veterinarian licensed to practice in Wyoming, Dr. Hopper was therefore permitted to earn a living in her chosen profession without relocating by practicing large animal medicine, a significant area of practice in this state. The restriction on the type of activity contained in the covenant was sufficiently limited to avoid undue hardship to Dr. Hopper while protecting the special interests of All Pet and Alpine.

In addition, as a professional, Dr. Hopper certainly realized the implications of agreeing to the terms of the covenant. While she may have doubted either her employers' desires to enforce the terms or the legality of the covenant, her actions in establishing a small animal practice violated the promise she made. In equity, she comes before the court with unclean hands. *Dutch Maid Bakeries*, 131 P.2d at 634. If Dr. Hopper sought to challenge the enforceability of the covenant, her proper remedy was to seek a declaratory judgment. Wyo.Stat. § 1–37–103 (1988). *See Stevenson*, 384 S.E.2d at 293 (declaratory judgment action brought by veterinarian against former employer to challenge covenant not to compete); *Beckman*, 296 S.E.2d at 567 (declaratory judgment action brought by television weather forecaster after former employer refused release from covenant not to compete).

The public will not suffer injury from enforcement of the covenant. Dr. Hopper's services at All Pet and Alpine were primarily to provide relief for the full-time veterinarians at those clinics. In addition to dividing her time between the clinics, she covered when others had days off or, on a rotating basis, on weekends. While Dr. Hopper provided competent care to All Pet's and Alpine's clients, her services there were neither unique nor uncommon. Furthermore, the services which Dr. Hopper provided in her new practice to small animal clients were available at several other veterinary clinics within Laramie. Evidence did not challenge the public's ability to receive complete and satisfactory service from these other sources. Dr. Hopper's short term unavailability resulting from enforcement of a reasonable restraint against unfair competition is unlikely, as a matter of law, to produce injury to the public.

Reasonable geographic restraints are generally limited to the area in which the former employee actually worked or from which clients were drawn. *Commercial Bankers Life Ins. Co. of America*, 516 N.E.2d at 114–15; *Brewer v. Tracy*, 198 Neb. 503, 253 N.W.2d 319, 322 (1977). When the business serves a limited geographic area, as opposed to statewide or nationwide, courts have upheld geographic limits which are coextensive with the area in which the employer conducts business. *Torrence v. Hewitt Associates*, 143 Ill.App.3d 520, 97 Ill.Dec. 592, 596, 493 N.E.2d 74, 78 (1986). A broad geographic restriction may be reasonable when it is coupled with a specific activity restriction within an industry or business which has an inherently limited client base. *System Concepts, Inc. v. Dixon*, 669 P.2d 421, 427 (Utah 1983).

The geographical limit contained in the covenant not to compete restricts Dr. Hopper from practicing within a five mile radius of the corporate limits of Laramie. As a matter of law, this limit is reasonable in this circumstance. The evidence presented at trial indicated that the clients of All Pet and Alpine were located throughout the county. Despite Wyoming's rural character, the five mile restriction effectively limited unfair competition without presenting an undue hardship. Dr. Hopper could, for example, have opened a practice at other locations within the county.

A durational limitation should be reasonably related to the legitimate interest which the employer is seeking to protect. Restatement (Second) of Contracts, *supra*, § 188 cmt. b.

In determining whether a restraint extends for a longer period of time than necessary to protect the employer, the court must determine how much time is needed for the risk of injury to be reasonably moderated. When the restraint is for the purpose of protecting customer relationships, its duration is reasonable only if it is no longer than necessary for the employer to put a new [individual] on the job and for the new employee to have a reasonable opportunity to demonstrate his [or her] effectiveness to the customers. If a restraint on this ground is justifiable at all, it seems that a period of several months would usually be reasonable. If the selling or servicing relationship is relatively complex, a longer period may be called for. Courts seldom criticize restraints of six months or a year on

the grounds of duration as such, and even longer restraints are often enforced.

Blake, 73 Harv.L.Rev. at 677 (footnote omitted). *See Amex Distributing Co., Inc. v. Mascari,* 150 Ariz. 510, 724 P.2d 596, 604–05 (1986) (quoting Blake and applying rule in determining that a three year duration of a covenant not to compete was unreasonable).

■ The evidence at trial focused on the durational requirement in attempting to establish the three year term as being necessary to diffuse the potential loss of clients from All Pet and Alpine to Dr. Hopper. Dr. Charles Sink, a licensed veterinarian, testified as an expert on behalf of All Pet and Alpine and indicated that in Wyoming, his experience correlated with national studies that disclosed about 70% of clients visit a clinic more than once per year. The remaining 30% of the clients use the clinic at least one time per year. Dr. Johnson estimated that at All Pet and Alpine, the average client seeks veterinarian services one and one-half times a year. Apart from this data about average client visits, other support for the three year durational requirement was derived from opinion testimony. Dr. Johnson admitted that influence over a client disappears in an unspecified "short period of time," but expressed a view that three years was "safe." He also agreed that the number of clients possibly transferring from All Pet or Alpine to Dr. Hopper would be greatest in the first year and diminish in the second year.

We are unable to find a reasonable relationship between the three year durational requirement and the protection of All Pet's and Alpine's special interests. Therefore, enforcement of the entire durational term contained in the covenant not to compete violates public policy as an unreasonable restraint of trade. Restatement (Second) of Contracts, *supra,* § 188. Based on figures of client visits, a replacement veterinarian at All Pet and Alpine would be able to effectively demonstrate his or her own professionalism to virtually all of the clinics' clients within a one year durational limit. Since no credible evidence was presented supporting the need for multiple visits to establish special influence over clients, a one year limit is sufficient to moderate the risk of injury to All Pet and Alpine from unfair competition by Dr. Hopper.

A one year durational limit sufficiently secures All Pet's and Alpine's interests in pricing policies and practice development information. Pricing policies at All Pet and Alpine were changed yearly, according to Dr. Johnson, to reflect changes in material and service costs provided by the clinics as well as new procedures. Practice development information, especially in a learned profession, loses its value quickly as technological change occurs and new reference material become available. We hold, as a matter of law, that enforcement of a one year durational limit is reasonable and sufficiently protects the interests of All Pet and Alpine without violating public policy.

Under the formulation of the rule of reason inquiry adopted by Wyoming from the first Restatement of Contracts, the unreasonableness of any non-divisible term of a covenant not to compete made the entire covenant unenforceable. Restatement of Contracts, *supra,* § 518. It is perhaps due to the arbitrary nature of this rule that no previous decision of this court has permitted enforcement of a covenant not to compete. *Tench,* 374 P.2d at 29; *Ridley,* 180 P.2d at 133; *Dutch Maid Bakeries,* 131 P.2d at 636. The conceptual difficulty of the position taken in the former Restatement of Contracts, *supra,* § 518 leads to strong criticism by noted authors and the rejection of this so-called "blue pencil rule" by many courts.

In very many cases the courts have held the whole contract to be illegal and void where the restraint imposed was in excess of what was reasonable and the terms of the agreement indicated no line of division that could be marked with a "blue pencil." *In the best considered modern cases, however, the court has decreed enforcement as against a defendant whose breach has occurred within an area in which restriction would clear-*

*ly be reasonable, even though the terms of the agreement imposed a larger and unreasonable restraint.* Thus, the seller of a purely local business who promised not to open a competing store anywhere in America has been prevented by injunction from running such a store within the same block as the one that he sold. In some cases it may be difficult to determine what is the exact limiting boundary of reasonable restriction; but often such a determination is not necessary. The question usually is whether a restriction against what the defendant has in fact done or is threatening would be a reasonable and valid restriction. The plaintiff should always be permitted to show the actual extent of the good will that is involved and that the defendant has committed a breach within that extent. If a restriction otherwise reasonable has no time limit, it is quite possible for the court to grant injunctive relief for a specific and reasonable time.

Arthur L. Corbin, *Corbin on Contracts* § 1390 at 69–73 (1962) (footnotes omitted and emphasis added).

■■■■■■ Restatement (Second) of Contracts, *supra,* § 184, which we now adopt, accepts the Corbin view permitting enforcement of a narrower term which is reasonable in a covenant not to compete:

(1) If less than all of an agreement is unenforceable under the rule stated in § 178 [dealing with restraints in violation of public policy in general], a court may nevertheless enforce the rest of the agreement in favor of a party who did not engage in serious misconduct if the performance as to which the agreement is unenforceable is not an essential part of the agreed exchange.

(2) A court may treat only part of a term as unenforceable under the rule stated in Subsection (1) if the party who seeks to enforce the term obtained it in good faith and in accordance with reasonable standards of fair dealing.

The position adopted in Restatement (Second) of Contracts, *supra,* § 184 does not permit the court to add to the terms of the covenant.

Sometimes a term is unenforceable on grounds of public policy because it is too broad, even though a narrower term would be enforceable. In such a situation, under Subsection (2), the court may refuse to enforce only part of the term, while enforcing the other part of the term as well as the rest of the agreement. The court's power in such a case is not a power of reformation, however, and it will not, in the course of determining what part of the term to enforce, add to the scope of the term in any way.

*Id.* at § 184 cmt. b.

We believe the ability to narrow the term of a covenant not to compete and enforce a reasonable restraint permits public policy to be served in the most effective manner. Businesses function through the efforts of dedicated employees who provide the services and build the products desired by customers. Both the employer and the employee invest in success by expressing a commitment to one another in the form of a reasonable covenant not to compete. For the employer, this commitment may mean providing the employee with access to trade secrets, customer contacts or special training. These assets of the business are entitled to protection. For the employee, who covenants as part of a bargained for exchange, the covenant provides notice of the limits both parties have accepted in their relationship. The employee benefits during his tenure with the employer by his or her greater importance to the organization as a result of the exposure to the trade secrets, customer contacts or special training. When the employer-employee relationship terminates, a reasonable covenant not to compete then avoids unfair competition by the employee against the former employer and the specter, which no court would enforce, of specific performance of the employment agreement. When the parties agree to terms of a covenant, one of which is too broad, the court is permitted to enforce a narrower term which effectuates these public policy goals without arbitrarily invalidating the entire agreement between the parties and creating an uncertain business environment. In those instances

where a truly unreasonable covenant operates as a restraint of trade, it will not be enforced.

Other jurisdictions have recognized that "[t]he arbitrary rule of 'all or nothing at all' in the enforcement of noncompetitive agreements has, in some cases, led to results of questionable equity." *Ehlers v. Iowa Warehouse Co.*, 188 N.W.2d 368, 371, *modified on other grounds*, 190 N.W.2d 413 (Iowa 1971) (adopting rule permitting total or partial enforcement of non-competitive agreements to the extent reasonable under the circumstances). *See Insurance Center, Inc. v. Taylor*, 94 Idaho 896, 499 P.2d 1252, 1255–56 (1972); *Solari Industries, Inc. v. Malady*, 55 N.J. 571, 264 A.2d 53, 61 (1970); and *Wood v. May*, 73 Wash.2d 307, 438 P.2d 587, 591 (1968). In applying what it termed a "rule of best result" approach to partial enforcement, the Supreme Court of Appeals of West Virginia summarized a sound three-step procedure for reviewing a covenant not to compete:

> (1) The court must determine that the covenant is reasonable, and is being used reasonably by the employer. If not, the covenant is set aside. If the covenant is inherently reasonable the inquiry continues. (2) The employer must show, under the circumstances, what legitimate interests of his are implicated. When these are established, the reasonable covenant is presumptively enforceable in its entirety. (3) The employee is then given the chance to rebut the presumptive enforceability of the covenant by showing either that he has no company trade assets to abuse, or that the assets made available to him properly belong to him, or that the interests asserted by the employer may be protected by a partial enforcement of the covenant. If the employee prevails in this latter regard then the covenant may be tailored by the court to comport with the equities of the case.

*Reddy*, 298 S.E.2d at 917.

 Enforcement of a one year durational term, along with the other terms of the covenant not to compete, is reasonable in light of the circumstances of this case.

Public policy is fairly served by this restraint on unfair competition by Dr. Hopper. All Pet and Alpine established irreparable harm from the loss of clients to unfair competition which entitled them to injunctive relief. While the terms of the covenant, as enforced, restrict Dr. Hopper's practice for a limited time, she will suffer no undue hardship from compliance with her bargained for promise. We, therefore, affirm the district court's conclusions of law that the type of activity and geographic limitations contained in the covenant not to compete were reasonable and enforceable as a matter of law. Because we hold that the covenant's three year durational term imposed a partially unreasonable restraint of trade, we remand for a modification of the judgment to enjoin Dr. Hopper from unfair competition for a duration of one year from the date of termination.

### B. *Damages for Violation of a Covenant Not to Compete*

 Wyoming's general rules of damage recovery are well established. "Damages must be proven with a reasonable degree of certainty; however, proof of exact damages is not required." *Coulthard v. Cossairt*, 803 P.2d 86, 92 (Wyo. 1990). In awarding damages, a court may not speculate or conjecture about the proper amount. *Reiman Const. Co. v. Jerry Hiller Co.*, 709 P.2d 1271, 1277 (Wyo.1985). A fundamental principle of damage assessment declares that a person injured receives only compensation for his loss and no more. *UNC Teton Exploration Drilling, Inc. v. Peyton*, 774 P.2d 584, 592 (Wyo.1989).

 No previous decision of this court has considered the proper measure of damages for a breach of a covenant not to compete which is ancillary to a valid employment contract. However, consistent with our general principles of damage recovery, we accept the view that "[l]ost profits are generally recognized as a proper element of recovery for breach of a covenant not to compete." *Matter of Isbell*, 27 B.R. 926, 930 (Bankr.W.D.Wis.

1983). *Accord Robert S. Weiss and Associates, Inc. v. Wiederlight,* 208 Conn. 525, 546 A.2d 216, 226 (1988) and *Weinrauch v. Kashkin,* 64 A.D.2d 897, 407 N.Y.S.2d 885, 886 (1978). *See Dunn v. Ward,* 105 Idaho 354, 670 P.2d 59, 61 (1983) (holding that in a sale of a business with a covenant not to compete, the measure of damages is lost profits and amount for impairment of goodwill). The lost profits are calculated based on a "net" figure requiring proof that: "(1) net profits were lost; (2) the amount of those profits can be determined with a reasonable degree of certainty; and (3) the defendant's breach was the proximate cause of the lost profits." Jeffrey L. Liddle & William F. Gray, Jr., *Proof of Damages for Breach of a Restrictive Covenant or Noncompetition Agreement,* 9 Employee Relations L.J. 455, 460 (1983). *See Wyoming Bancorporation v. Bonham,* 563 P.2d 1382, 1385 (Wyo.1977) (stating the rule that calculation of lost future profits must be made with "best proof available as to amount of loss").

 All Pet and Alpine presented three approaches to computing a damage figure. The first system considered an average fee charged for veterinarian services at All Pet and Alpine which was multiplied by the number of clients believed lost to Dr. Hopper. The second method considered the amount of profit realized by Dr. Hopper on the services she provided to former clients of All Pet and Alpine. The third approach calculated a loss of profits at All Pet and Alpine from a reduction in the total number of client visits in the year following Dr. Hopper's departure.

All three of All Pet's and Alpine's methods of damage calculation were based on figures for gross profits. In his testimony, Dr. Johnson speculated that his net profits from the lost clients would be ninety percent of the gross. He based this figure on the incredible assumption that his only costs for servicing these clients would be drugs. Dr. Johnson testified that his other fixed costs, including mortgage and receptionist, were paid for by the first clients who come in to the clinics. He assumed that the profit margin from all clients lost

to Dr. Hopper would be at a higher rate because the lost clients would be served at the clinics after all fixed costs were paid.

The finding of the district court that the amount of damages suffered was speculative and unproven by a preponderance of the evidence is not clearly erroneous. The ninety percent net profit assumption defies logic and does not represent any attempt to apply common accounting principles, such as prorating of expenses. The necessary costs of doing business, such as costs of drugs dispensed, accounting charges, staff wages and depreciation on the value of equipment, were never established. Calculating the cost and expense of operation is an essential item in the proof of damages in a suit seeking net lost profits for violation of a covenant not to compete. *Mills v. Murray,* 472 S.W.2d 6, 16 (Mo.App.1971). Without these calculations, All Pet's and Alpine's damage claims fail.

## V. CONCLUSION

 A well-drafted covenant not to compete preserves a careful and necessary economic balance in our society. While there are many layers to the employer-employee relationship, preventing unfair competition from employees who misuse trade secrets or special influence over customers serves public policy. Tempering the balance is the need to protect employees from unfair restraints on competition which defeat broad policy goals in favor of small business and individual advancement. Courts, in reviewing covenants not to compete, must consider these policy implications in assessing the reasonableness of the restraint as it applies to both employer and employee.

Affirmed as modified and remanded for issuance of a judgment in conformity herewith.

CARDINE, J., filed dissenting opinion.

CARDINE, Justice, dissenting.

Glenna Hopper has beaten the system. Just prior to being terminated, Dr. Hopper informed Dr. Johnson that "the [covenant] isn't worth the paper it's written on." And

she was right. Upon termination, she went into the veterinary business in violation of her covenant not to compete. From July 15, 1991, until October 6, 1992, Dr. Hopper practiced small animal medicine in violation of her solemn promise in her employment agreement not to compete. Whether she continued to practice small animal veterinary medicine after October 6, 1992, in violation of the covenant is not disclosed by the record on appeal.

The court has now decided as a matter of law that a one-year non-competition restriction is reasonable, and a longer period is unreasonable. This pronouncement establishes for the future the period during which competition can be restricted. In this case, appellant may have continued violating the covenant during her appeal— or she may have complied. We do not know. The trial court, on remand, should determine this question, and appellant ought to at least satisfy the one-year non-compete now imposed by this court.

I would hold, therefore, that the covenant was supported by consideration from the beginning and was lawful and enforceable, and I would require that appellant be enjoined from that part of the practice of veterinary medicine specified in the covenant not to compete from the date the trial court, on remand, enters its modified judgment for at least the one-year period which this court now finds reasonable.