2001 WY 60

Karl W. ROSSEL, Appellant (Plaintiff),

v.

Irmtrud MILLER and Eric V. Miller, as Individuals and as Trustees of the Miller Revocable Trust, Appellees (Defendants).

No. 00–42.

Supreme Court of Wyoming.

July 11, 2001.*

* This case was originally assigned to Justice Thomas on October 4, 2000, for the rendering of a proffered majority opinion. The case was reassigned to Justice Kite on February 5, 2001.

---

Bernard Q. Phelan of Phelan Watson Law Office, Cheyenne, WY, Representing Appellant.

Bert T. Ahlstrom, Jr., Cheyenne, WY, Representing Appellees.

Before LEHMAN, C.J., and GOLDEN, HILL, and KITE, JJ.

KITE, Justice.

[¶ 1] This appeal presents a dispute between siblings. Karl Rossel sought imposition of a constructive trust and an accounting for real and personal property he contends was converted by his sister, Irmtrud Miller, and her husband, Eric Miller. He also sought a judgment for $25,000, an amount he claimed was a debt owed by the Millers. The trial court imposed a partial constructive trust for Mr. Rossel on fifty-two and a half acres of the real property and awarded the Millers five acres described as the homestead plot. The complaint was dismissed with prejudice as it related to the personal property, including joint account funds and the $25,000 alleged loan. We affirm.

## ISSUE

[¶ 2] Mr. Rossel presents the following issue for our review:

Was the court's finding that a constructive trust should be imposed on only a portion of the assets transferred to a family member under an implied promise clearly erroneous?

The Millers did not provide a statement of the issues in their brief.

## FACTS

[¶ 3] The facts presented in this appeal are often conflicting and complicated. Mr. Rossel is a German citizen while the Millers are United States citizens. In 1973, Mr. Rossel executed a contract with his mother in Germany which provided that upon her death he would inherit her home and garden located in Germany and he would be obligated to pay Mrs. Miller the equivalent of 50,000 German marks as her share of the inheritance.[1] The contract required the inheritance payment to be made in three installments over a three-year period.[2] In 1990, the mother died leaving Mr. Rossel with the obligation to satisfy the contract. He paid the first installment of $20,000 to Mrs. Miller, but, due to financial problems, the next installment was delayed. In time, Mr. Rossel paid another installment of $30,000 to Mrs. Miller.

[¶ 4] In 1992 or 1993, Mr. Rossel came to the United States with an interest in purchasing land in either Wyoming or Colorado. Mr. Miller accompanied Mr. Rossel to Cheyenne where they located fifty-seven and a half acres in Buford to purchase. The final purchase price for the land was $47,000. The proposed plan for the property was that Mr. Rossel would give the Millers enough land on which to build a house so Mr. Rossel and his family could stay with the Millers while visiting the United States. Mr. Rossel made an earnest money deposit of $30,000, which left a balance of $17,000 on the purchase price.

[¶ 5] At this point, the parties' versions of the events diverge. Upon his return to Germany, Mr. Rossel sent the Millers approximately $61,000 which he claims was comprised of $22,000 in satisfaction of the third and final installment of Mrs. Miller's inheritance, $17,000 as the final payment on the Buford property, and an additional $22,000 which was a supplementary gift for Mrs. Miller. Mrs. Miller maintains the $22,000 was not a gift but rather was an additional payment toward the balance due on her inheritance.

---

1. There is not an explanation in the record as to the conversion rate from German marks to United States dollars for the periods of time at issue.

2. The record does not reveal the exact amount which was to be paid in each installment.

[¶ 6] Mr. Rossel further asserts that, in 1993 or 1994, Mr. Miller called him and asked for a $25,000 loan to buy a house in Cheyenne. The Millers claim they wanted to have a house in Cheyenne while they supervised the construction of the Buford home. The Millers contend they never asked Mr. Rossel for a loan but rather purchased the home with their own savings. Mr. Rossel did in fact wire $25,000 and did not ask for or receive anything in writing to declare the terms of the alleged loan, including any mention of when or how the loan would be repaid. The Millers received the money the day before the closing on their new home. Mrs. Miller claims the $25,000 was another justified payment on her inheritance.

[¶ 7] Mr. Rossel and Mrs. Miller also opened a joint bank account in Cheyenne. According to Mr. Rossel, the account allowed him to have money available when he visited the United States. Mr. Rossel also asserts the funds were intended to cover the costs of maintaining the real property. Improvements made on the land, including drilling a well and planting trees, were paid for with money from the joint account funded by Mr. Rossel. In addition, a truck and two all-terrain vehicles were purchased with joint account money.

[¶ 8] Upon a deterioration of relations between Mr. Rossel and the Millers, Mr. Rossel decided to build a home on the Buford property, as the planned construction for a home with the Millers had not been realized. Mr. Rossel foresaw a difficult time obtaining financing for the construction of the home as a foreign citizen. As a result, in January 1995 he executed a warranty deed which passed the entire Buford property to Eric and Irmtrud Miller as trustees of the Miller Revocable Trust with the intent that they would obtain a loan. Mr. Rossel claimed it was very clear that, after he repaid the loan, the property would be reconveyed to him. Mrs. Miller again claims the property was conveyed to her as part of her inheritance.

[¶ 9] In October or November of 1995, Mr. Rossel asked Mrs. Miller for paperwork which he needed for German tax purposes. He wanted the paperwork to identify the previous payment of $22,000 as an inheritance payment, the remaining $22,000 as a gift, and $25,000 as a loan to the Millers. Mrs. Miller refused to supply the requested paperwork and cut off all further contact with Mr. Rossel. Subsequently, Mr. Rossel was not allowed on the Buford land, and the Millers denied his request for reconveyance of the land. In addition, Mrs. Miller transferred the approximate $13,000 balance of the joint account into her own savings account.

[¶ 10] The basis for Mrs. Miller's contentions is that she had not received the full share of her inheritance. Mrs. Miller testified it was her understanding of German law that upon the death of a parent, if two children survive, each child receives fifty percent of the property. Mrs. Miller believed that the stated value of the property was 120,000 German marks and under the contract she was to receive only 50,000 marks, which was less than fifty percent.[3] She also questioned what was determined to be the value of the property, and, due to all the relevant circumstances, she believed Mr. Rossel actually owed her a total of $150,000. Both parties testified regarding a ten-year "look-back period" under German law, which would allow Mrs. Miller to sue Mr. Rossel for an accounting of the funds and property acquired from their mother. Mrs. Miller claims she reached an agreement with Mr. Rossel not to pursue litigation against him in Germany on the basis of his promise to pay her the full share of her inheritance.

[¶ 11] The trial court heard the case without a jury on August 4, 1999. It found Mr. Rossel submitted certain sums of money and property to the Millers, which he insisted was to be held in constructive trust on his behalf. The trial court noted the Millers contended the money and property were delivered in payment of Mrs. Miller's share of her mother's estate, which Mr. Rossel controlled. In light of the often directly conflicting testimony, the trial court found the

---

3. Again, there is not an explanation in the record as to the conversion rate from German marks to United States dollars during the period at issue.

Millers' position more tenable and to be in conformance with the facts and circumstances of the case. The trial court imposed a partial constructive trust for Mr. Rossel on fifty-two and a half acres of land and awarded the Millers five acres described as the homestead plot. The claims pertaining to the personal property, which included the alleged $25,000 loan and the joint account funds, were dismissed with prejudice. Mr. Rossel appealed the trial court's order.

## STANDARD OF REVIEW

[¶ 12] The purpose of special findings under W.R.C.P. 52(a) is to inform the appellate court of the underlying facts supporting the trial court's conclusions of law and disposition of the issues. *Hopper v. All Pet Animal Clinic, Inc.*, 861 P.2d 531, 538 (Wyo.1993). While the findings are presumptively correct, the appellate court may examine all the properly admissible evidence in the record. *Id.* In accordance with W.R.C.P. 52(a), we will not set aside a trial court's findings of fact unless the findings are clearly erroneous. *McNeiley v. Ayres Jewelry Co.*, 886 P.2d 595, 597 (Wyo.1994). "A finding is 'clearly erroneous' when[,] although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948); *see also McNeiley*, 886 P.2d at 597; *Hopper*, 861 P.2d at 538.

## DISCUSSION

[¶ 13] A constructive trust arises by construction of the court when equity so demands. 76 Am.Jur.2d *Trusts* § 200 (1992). It is an equitable remedy imposed to compel a person who unfairly holds a property interest to hold property in trust for the person for whom in equity and good conscience it should be held. *Id.* There must be some or all the following elements: a promise, either express or implied, a transfer made in reliance of that promise, and unjust enrichment. *Id.*, at § 205.

[¶ 14] The parties correctly state that we have approved the imposition of a construc-

tive trust in proper circumstances. Mr. Rossel offers *Thomasi v. Koch*, 660 P.2d 806 (Wyo.1983), as authority for the imposition of a constructive trust for real property in Wyoming. The facts in the instant case are clearly distinguishable from the facts in *Thomasi* in which all the necessary elements of a constructive trust were established. 660 P.2d at 811.

[¶ 15] Mr. Rossel also points to this court's decision in *Fuller v. Fuller*, 606 P.2d 306 (Wyo.1980), wherein we found proper circumstances existed to impose a constructive trust. Again, the facts in *Fuller* are dissimilar. This court imposed a constructive trust based upon a finding of unjust enrichment. We noted that "Scott on Trusts, Vol. V, Third Edition (1967) § 462.2 at page 3417, says that a constructive trust 'arises where the retention of property would result in the unjust enrichment of the person retaining it.'" 606 P.2d at 309. Equity "abhors unjust enrichment." *Wantulok v. Wantulok*, 67 Wyo. 22, 50, 223 P.2d 1030, 1032 (1950); *see also Fuller*, 606 P.2d at 309. In the instant case, this court is not persuaded that unjust enrichment will result if the trial court's order stands.

[¶ 16] This court gives deference to the trial court's opportunity to assess the witnesses' credibility. *Hopper*, 861 P.2d at 538. The trial court referenced its overall impression that Mr. Rossel was a sophisticated handler of assets and yet he made all the substantial transfers of valuable property at issue in this case to Mrs. Miller without any writing or formal memorialization. This seemed inconsistent with his prior meticulous and cautious approach by which he properly formalized the contract with his mother, in part prompted out of concern that Mrs. Miller possessed ill motives. The trial court additionally found that Mr. Rossel sought to set up the property transfers in such a way that their ambiguous nature and purpose would suit his own intentions. In particular, the court alluded to his potentially unlawful conduct with the German revenue authorities. The court also found it significant that Mr. Rossel did in fact pay Mrs. Miller in excess of the 1973 contract requirements,

which implied acknowledgment by Mr. Rossel that he owed Mrs. Miller more than he had originally paid her out of their mother's estate.

[¶ 17] The trial court recognized the directly conflicting accounts of the parties. As a result, it imposed a partial constructive trust with regard to the real estate excepting therefrom five acres of homestead property. The trial court found Mr. Rossel failed to meet his burden with regard to the joint account and, therefore, no constructive trust was warranted. Likewise, the trial court dismissed Mr. Rossel's claim seeking judgment for the alleged $25,000 loan.

[¶ 18] Our review is limited to examining the record, and we give due deference to the trial court's reasoning and ability to assess the credibility of the parties' versions of the events. The trial court's decision with regard to the joint account is justified by the evidence wherein it did not find the existence of a promise, a transfer made in reliance of that promise, or unjust enrichment. The trial court found the evidence was less than satisfactory as it related to the real property and determined there were grounds to provide Mr. Rossel some equitable relief. "[I]t is the district court, not this court, which must be satisfied that there was clear and convincing evidence sufficient to establish a constructive trust." *Thomasi*, 660 P.2d at 811.

[¶ 19] Mr. Rossel further argues the trial court erred in distinguishing between the real property and the joint account in its order. He contends that, for the order to be internally consistent, either the real property and the funds in the joint account were given to Mrs. Miller with the implied trust and understanding that they were being held for Mr. Rossel's benefit or they were given to her in settlement of her claims on the estate. We resolved this issue in *Thomasi*, 660 P.2d at 810:

> While serving on the bench of the State of New York, Justice Cardozo tellingly stated the inherent qualities of a constructive trust as a remedial and flexible device:
>
> A constructive trust is the formula through which the conscience of equity finds expression. When property has

been acquired in such circumstances that the holder of legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee.

> . . . .

> ... A court in equity in decreeing a constructive trust is bound by no unyielding formula. The equity of the transaction must shape the measure of relief.

*Beatty v. Guggenheim Exploration Co.*, 225 N.Y. 380, 122 N.E. 378, 380, 381 (1919).

This court concludes, based on the conflicting facts and circumstances evident in the record, that the trial court's order achieved an equitable resolution. Upon our thorough review of the record, we find no error.

[¶ 20] Affirmed.