# CITIBANK, N. A. *v.* WELLS FARGO ASIA LTD.

No. 88–1260.   Argued March 19, 1990—Decided May 29, 1990

KENNEDY, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and BRENNAN, WHITE, MARSHALL, BLACKMUN, O'CONNOR, and SCALIA, JJ., joined. REHNQUIST, C. J., filed a concurring opinion, *post*, p. 674. STEVENS, J., filed a dissenting opinion., *post*, p. 674.

*Robert H. Bork* argued the cause for petitioner. With him on the briefs were *Arnold M. Lerman, David Westin, Kenneth S. Geller*, and *Mark I. Levy*.

*Deputy Solicitor General Merrill* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Starr, Assistant Attorney General Gerson, Jeffrey P. Minear, Abraham D. Sofaer, J. Virgil Mattingly*, and *Robert B. Serino*.

*Darryl Snider* argued the cause for respondent. With him on the brief were *George A. Cumming, Jr., Thomas M. Peterson*, and *Edwin E. McAmis*.\*

JUSTICE KENNEDY delivered the opinion of the Court.

At issue here is whether the home office of a United States bank is obligated to use its general assets to repay a Eurodollar deposit made at one of its foreign branches, after the foreign country's government has prohibited the branch from making repayment out of its own assets.

## I

The case arises from a transaction in what is known in the banking and financial communities as the Eurodollar market. As the District Court defined the term, Eurodollars are

---

\**John L. Warden, Michael M. Wiseman, Michael S. Straus*, and *Norman R. Nelson* filed a brief for the New York Clearing House Association et al. as *amici curiae* urging reversal.

*Dennis G. Lyons* filed a brief for the Bank of Montreal et al. as *amici curiae* urging affirmance.

United States dollars that have been deposited with a banking institution located outside the United States, with a corresponding obligation on the part of the banking institution to repay the deposit in United States dollars. See App. to Pet. for Cert. 42a; P. Oppenheim, International Banking 243 (5th ed. 1987). The banking institution receiving the deposit can be either a foreign branch of a United States bank or a foreign bank.

A major component of the Eurodollar market is interbank trading. In a typical interbank transaction in the Eurodollar market, the depositing bank (Bank A) agrees by telephone or telex, or through a broker, to place a deposit denominated in United States dollars with a second bank (Bank X). For the deposit to be a Eurodollar deposit, Bank X must be either a foreign branch of a United States bank or a foreign bank; Bank A, however, can be any bank, including one located in the United States. To complete the transactions, most banks that participate in the interbank trading market utilize correspondent banks in New York City, with whom they maintain, directly or indirectly, accounts denominated in United States dollars. In this example, the depositor bank, Bank A, orders its correspondent bank in New York (Bank B) to transfer United States dollars from Bank A's account to Bank X's account with Bank X's New York correspondent bank (Bank Y). The transfer of funds from Bank B to Bank Y is accomplished by means of a wire transfer through a clearing mechanism located in New York City and known as the Clearing House Interbank Payments System, or "CHIPS." See Scanlon, Definitions and Mechanics of Eurodollar Transactions, in The Eurodollar 16, 24–25 (H. Prochnow ed. 1970); Brief for New York Clearing House Association et al. as *Amici Curiae* 4. Repayment of the funds at the end of the deposit term is accomplished by having Bank Y transfer funds from Bank X's account to Bank B, through the CHIPS system, for credit to Bank A's account.

The transaction at issue here follows this pattern. Respondent Wells Fargo Asia Limited (WFAL) is a Singapore-chartered bank wholly owned by Wells Fargo Bank, N. A., a bank chartered by the United States. Petitioner Citibank, N. A. (Citibank), also a United States-chartered bank, operates a branch office in Manila, Philippines (Citibank/Manila). On June 10, 1983, WFAL agreed to make two $1 million time deposits with Citibank/Manila. The rate at which the deposits would earn interest was set at 10%, and the parties agreed that the deposits would be repaid on December 9 and 10, 1983. The deposits were arranged by oral agreement through the assistance of an Asian money broker, which made a written report to the parties that stated, *inter alia:*

> "'Pay: Citibank, N. A. New York Account Manila
>
> "'Repay: Wells Fargo International, New York Account Wells Fargo Asia Ltd., Singapore Account #003–023645.'" 852 F. 2d 657, 658–659 (CA2 1988).

The broker also sent WFAL a telex containing the following "'[i]nstructions'":

> "'Settlement—Citibank NA NYC AC Manila
>
> "'Repayment—Wells Fargo Bk Intl NYC Ac Wells Fargo Asia Ltd Sgp No 003–023645.'" *Id.*, at 659.

That same day, the parties exchanged telexes confirming each of the two deposits. WFAL's telexes to Citibank/Manila read:

> "'We shall instruct Wells Fargo Bk Int'l New York our correspondent please pay to our a/c with Wells Fargo Bk Int'l New York to pay to Citibank NA customer's correspondent USD 1,000,000.'" *Ibid.*

The telexes from Citibank/Manila to WFAL read:

> "'Please remit US Dlr 1,000,000 to our account with Citibank New York. At maturity we remit US Dlr 1,049,444.44 to your account with Wells Fargo Bank Intl Corp NY through Citibank New York.'" *Ibid.*

A few months after the deposit was made, the Philippine government issued a Memorandum to Authorized Agent Banks (MAAB 47) which provided in relevant part:

> "'Any remittance of foreign exchange for repayment of principal on all foreign obligations due to foreign banks and/or financial institutions, irrespective of maturity, shall be submitted to the Central Bank [of the Philippines] thru the Management of External Debt and Investment Accounts Department (MEDIAD) for prior approval.'" *Ibid.*

According to the Court of Appeals, "[a]s interpreted by the Central Bank of the Philippines, this decree prevented Citibank/Manila, an 'authorized agent bank' under Philippine law, from repaying the WFAL deposits with its Philippine assets, *i. e.*, those assets not either deposited in banks elsewhere or invested in non-Philippine enterprises." *Ibid.* As a result, Citibank/Manila refused to repay WFAL's deposits when they matured in December 1983.

WFAL commenced the present action against Citibank in the United States District Court for the Southern District of New York, claiming that Citibank in New York was liable for the funds that WFAL deposited with Citibank/Manila. While the lawsuit was pending, Citibank obtained permission from the Central Bank of the Philippines to repay its Manila depositors to the extent that it could do so with the non-Philippine assets of the Manila branch. It paid WFAL $934,000; the remainder of the deposits, $1,066,000, remains in dispute. During the course of this litigation, Citibank/ Manila, with the apparent consent of the Philippine government, has continued to pay WFAL interest on the outstanding principal. See App. to Pet. for Cert. 48a.

After a bench trial on the merits, the District Court accepted WFAL's invitation to assume that Philippine law governs the action. The court saw the issue to be whether, under Philippine law, a depositor with Citibank/Manila may look to assets booked at Citibank's non-Philippine offices for

repayment of the deposits. After considering affidavits from the parties, it concluded (1) that under Philippine law an obligation incurred by a branch is an obligation of the bank as a whole; (2) that repayment of WFAL's deposits with assets booked at Citibank offices other than Citibank/Manila would not contravene MAAB 47; and (3) that Citibank therefore was obligated to repay WFAL, even if it could do so only from assets not booked at Citibank/Manila. *Id.*, at 31a–35a. It entered judgment for WFAL, and Citibank appealed.

A panel of the United States Court of Appeals for the Second Circuit remanded the case to the District Court to clarify the basis for its judgment. The Second Circuit ordered the District Court to make supplemental findings of fact and conclusions of law on the following matters:

> "(a) Whether the parties agreed as to where the debt could be repaid, including whether they agreed that the deposits were collectible only in Manila.
>
> "(b) If there was an agreement, what were its essential terms?
>
> "(c) Whether Philippine law (other than MAAB 47) precludes or negates an agreement between the parties to have the deposits collectible outside of Manila.
>
> "(d) If there is no controlling Philippine law referred to in (c) above, what law does control?" *Id.*, at 26a.

In response to the first query, the District Court distinguished the concepts of repayment and collection, defining repayment as "refer[ring] to the location where the wire transfers effectuating repayment at maturity were to occur," and collection as "refer[ring] to the place or places where plaintiff was entitled to look for satisfaction of its deposits in the event that Citibank should fail to make the required wire transfers at the place of repayment." *Id.*, at 14a. It concluded that the parties' confirmation slips established an agreement that repayment was to occur in New York, and that there was neither an express agreement nor one that

could be implied from custom or usage in the Eurodollar market on the issue of where the deposits could be collected. In response to the second question, the court stated that "[t]he only agreement relating to collection or repayment was that repayment would occur in New York." *Id.*, at 18a. As to third query, the court stated that it knew of no provision of Philippine law that barred an agreement making WFAL's deposits collectible outside Manila. Finally, in response to the last query, the District Court restated the issue in the case as follows:

> "Hence, the dispute in this case . . . boils down to one question: is Citibank obligated to use its worldwide assets to satisfy plaintiff's deposits? In other words, the dispute is not so much about where repayment physically was to be made or where the deposits were collectible, but rather which assets Citibank is required to use in order to satisfy its obligation to plaintiff. As we have previously found that the contract was silent on this issue, we interpret query (d) as imposing upon us the task . . . of deciding whether New York or Philippine law controls the answer to that question." *Id.*, at 19a.

The District Court held that, under either New York or federal choice-of-law rules, New York law should be applied. After reviewing New York law, it held that Citibank was liable for WFAL's deposits with Citibank/Manila, and that WFAL could look to Citibank's worldwide assets for satisfaction of its deposits.

The Second Circuit affirmed, but on different grounds. Citing general banking law principles, the Court of Appeals reasoned that, in the ordinary course, a party who makes a deposit with a foreign branch of a bank can demand repayment of the deposit only at that branch. In the court's view, however, these same principles established that this "normal limitation" could be altered by an agreement between the bank and the depositor: "If the parties agree that repayment of a deposit in a foreign bank or branch may occur at another

location, they authorize demand and collection at that other location." 852 F. 2d, at 660. The court noted that the District Court had found that Citibank had agreed to repay WFAL's deposits in New York. It concluded that the District Court's finding was not clearly erroneous under Federal Rule of Civil Procedure 52(a), and held that, as a result, WFAL was entitled "to collect the deposits out of Citibank assets in New York." 852 F. 2d., at 661.

We granted certiorari. 493 U. S. 990 (1989). We decide that the factual premise on which the Second Circuit relied in deciding the case contradicts the factual determinations made by the District Court, determinations that are not clearly erroneous. We vacate the judgment and remand the case to the Court of Appeals for further consideration of the additional legal questions in the case.

## II

Little need be said respecting the operation or effect of the Philippine decree at this stage of the case, for no party questions the conclusion reached by both the District Court and the Court of Appeals that Philippine law does not bar the collection of WFAL's deposits from the general assets of Citibank in the State of New York. See 852 F. 2d, at 660–661; App. to Pet. for Cert. 18a. The question, rather, is whether Citibank is obligated to allow collection in New York, and on this point two principal theories must be examined. The first is that there was an agreement between the parties to permit collection in New York, or indeed at any place where Citibank has assets, an agreement implied from all the facts in the case as being within the contemplation of the parties. A second, and alternative, theory for permitting collection is that, assuming no such agreement, there is a duty to pay in New York in any event, a duty that the law creates when the parties have not contracted otherwise. See 3 A. Corbin, Contracts § 561, pp. 276–277 (1960).

The Court of Appeals appears to have relied upon the first theory we have noted, adopting the premise that the parties did contract to permit recovery from the general assets of Citibank in New York. Yet the District Court had made it clear that there is a distinction between an agreement on "repayment," which refers to the physical location for transacting discharge of the debt, and an agreement respecting "collection," which refers to the location where assets may be taken to satisfy it, and in quite specific terms, it found that the only agreement the parties made referred to repayment.

The Court of Appeals, while it said that this finding was not clearly erroneous, appears to have viewed repayment and collection as interchangeable concepts, not divisible ones. It concluded that the agreement as to where repayment could occur constituted also an agreement as to which bank assets the depositor could look to for collection. The strongest indication that the Court of Appeals was interpreting the District Court's findings in this manner is its answer to the argument, made by the United States as *amicus curiae*, that the home office of a bank should not bear the risk of foreign restrictions on the payment of assets from the foreign branch where a deposit has been placed, unless it makes an express agreement to do so. The court announced that "[o]ur affirmance in the present case is based on *the district court's finding of just such an agreement.*" 852 F. 2d, at 661 (emphasis added).

That the Court of Appeals based its ruling on the premise of an agreement between the parties is apparent as well from the authorities upon which it relied to support its holding. The court cited three cases for the proposition that an agreement to repay at a particular location authorizes the depositor to collect the deposits at that location, all of which involve applications of the act of state doctrine: *Allied Bank International* v. *Banco Credito Agricola de Cartago*, 757 F. 2d 516 (CA2), cert. dism'd, 473 U. S. 934 (1985); *Garcia* v. *Chase Manhattan Bank, N. A.*, 735 F. 2d 645, 650–651 (CA2 1984);

and *Braka* v. *Bancomer, S. N. C.*, 762 F. 2d 222, 225 (CA2 1985). Each of these three cases turns upon the existence, or nonexistence, of an agreement for collection. In *Garcia* and *Allied Bank*, the agreement of the parties to permit collection at a location outside of the foreign country made the legal action of the foreign country irrelevant. See *Garcia*, 735 F. 2d, at 646 (agreement between the parties was that "Chase's main office in New York would guarantee the certificate [of deposit] and that [the depositors] could be repaid by presenting the certificate at any Chase branch worldwide"); *id.*, at 650 (purpose of the agreement was "to ensure that, no matter what happened in Cuba, including seizure of the debt, Chase would still have a contractual obligation to pay the depositors upon presentation of their CDs"); *Allied Bank, supra*, at 522 (agreement between the parties was that Costa Rican banks' obligation to repay various loans in New York "would not be excused in the event that Central Bank [of Costa Rica] failed to provide the necessary United States dollars for payment"). In *Braka*, the agreement between the parties was that repayment and collection would be permitted only in the foreign country, and so the foreign law controlled. See 762 F. 2d, at 224–225 (specifically distinguishing *Garcia* on the ground that the bank had not guaranteed repayment of the deposits outside of Mexico). By its reliance upon these cases, the Court of Appeals, it seems to us, must have been relying upon the existence of an agreement between Citibank and WFAL to permit collection in New York. As noted above, however, this premise contradicts the express finding of the District Court.

Under Federal Rule of Civil Procedure 52(a), the Court of Appeals is permitted to reject the District Court's findings only if those findings are clearly erroneous. As the Court of Appeals itself acknowledged, the record contains ample support for the District Court's finding that the parties agreed that repayment, defined as the wire transfers effecting the transfer of funds to WFAL when its deposits matured, would

take place in New York. The confirmation slips exchanged by the parties are explicit: The transfer of funds upon maturity was to occur through wire transfers made by the parties' correspondent banks in New York. See *supra*, at 664.

As to collection, the District Court found that neither the parties' confirmation slips nor the evidence offered at trial with regard to whether "an agreement concerning the place of collection could be implied from custom and usage in the international banking field" established an agreement respecting collection. See App. to Pet. for Cert. 16a–17a. Upon review of the record, we hold this finding, that no such implied agreement existed based on the intent of the parties, was not clearly erroneous. The confirmation slips do not indicate an agreement that WFAL could collect its deposits from Citibank assets in New York; indeed, Citibank/Manila's confirmation slip, stating that "[a]t maturity *we* remit US Dlr 1,049,444.44 to your account with Wells Fargo Bank Intl Corp NY *through Citibank New York*," see *supra*, at 664 (emphasis added), tends to negate the existence of any such agreement. The telexes from the money broker who arranged the deposits speak in terms of repayment, and indicate no more than that repayment was to be made to WFAL's account with its correspondent bank in New York; they do not indicate any agreement about where WFAL could collect its deposits in the event that Citibank/Manila failed to remit payment upon maturity to this account.

Nor does the evidence contradict the District Court's conclusion that the parties, in this particular case, failed to establish a relevant custom or practice in the international banking community from which it could be inferred that the parties had a tacit understanding on the point. Citibank's experts testified that the common understanding in the banking community was that the higher interest rates offered for Eurodollar deposits, in contrast to dollar deposits with United States banks, reflected in part the fact that the deposits were not subject to reserve and insurance requirements

imposed on domestic deposits by United States banking law. This could only be the case, argues Citibank, if the deposits were "payable only" outside of the United States, as required by 38 Stat. 270, as amended, 12 U. S. C. § 461(b)(6), and 64 Stat. 873, as amended, 12 U. S. C. § 1813(l)(5). It argues further that higher rates reflected the depositor's assumption of foreign "sovereign risk," defined as the risk that actions by the foreign government having legal control over the foreign branch and its assets would render the branch unable to repay the deposit. See, *e. g.*, App. 354–367 (testimony of Ian H. Giddy).

WFAL's experts, on the other hand, testified that the identical interest rates being offered for Eurodollar deposits in both Manila and London at the time the deposits were made, despite the conceded differences in sovereign risk between the two locations, reflected an understanding that the home office of a bank was liable for repayment in the event that its foreign branch was unable to repay for any reason, including restrictions imposed by a foreign government. See, *e. g.*, *id.*, at 270–272 (testimony of Gunter Dufey).

A fair reading of all of the testimony supports the conclusion that, at least in this trial, on the issue of the allocation of sovereign risk there was a wide variance of opinion in the international banking community. We cannot say that we are left with "the definite and firm conviction" that the District Court's findings are erroneous. *United States* v. *United States Gypsum Co.*, 333 U. S. 364, 395 (1948). Because the Court of Appeals' holding relies upon contrary factual assumptions, the judgment for WFAL cannot be affirmed under the reasoning used by that court.

Given the finding of the District Court that there was no agreement between the parties respecting collection from Citibank's general assets in New York, the question becomes whether collection is permitted nonetheless by rights and duties implied by law. As is its right, see *Dandridge* v. *Williams*, 397 U. S. 471, 475–476, and n. 6 (1970), WFAL seeks

to defend the judgment below on the ground that, under principles of either New York or Philippine law, Citibank was obligated to make its general assets available for collection of WFAL's deposits. See Brief for Respondent 18, 23, 30–49. It is unclear from the opinion of the Court of Appeals which law it found to be controlling; and we decide to remand the case for the Court of Appeals to determine which law applies, and the content of that law. See *Thigpen* v. *Roberts*, 468 U. S. 27, 32 (1984); *Dandridge, supra,* at 475–476, and n. 6.

One of WFAL's contentions is that the Court of Appeals' opinion can be supported on the theory that it is based upon New York law. We do not think this is a fair or necessary construction of the opinion. The Court of Appeals placed express reliance on its own opinion in *Garcia* v. *Chase Manhattan Bank, N. A.,* 735 F. 2d 645 (CA2 1984), without citing or discussing *Perez* v. *Chase Manhattan Bank, N. A.,* 61 N. Y. 2d 460, 463 N. E. 2d 5 (1984). In that case, the New York Court of Appeals was explicit in pointing out that its decision was in conflict with that reached two days earlier by the Second Circuit in *Garcia, supra,* a case that the *Perez* court deemed "similar on its facts." See 61 N. Y. 2d, at 464, n. 3, 463 N. E. 2d, at 9, n. 3. Given this alignment of authorities, we are reluctant to interpret the Court of Appeals' decision as resting on principles of state law. The opinion of the Court of Appeals, moreover, refers to "general banking law principles" and "United States law," 852 F. 2d, at 660; whether this is the semantic or legal equivalent of the law of New York is for the Court of Appeals to say in the first instance.

Alternatively, if the Court of Appeals, based upon its particular expertise in the law of New York and commercial matters generally, is of the view that the controlling rule is supplied by Philippine law or, as Citibank would have it, by a federal common-law rule respecting bank deposits, it should make that determination, subject to any further review we deem appropriate. In view of our remand, we find

674

it premature to consider the other contentions of the parties respecting the necessity for any rule of federal common law, or the pre-emptive effect of federal statutes and regulations on bank deposits and reserves. See 12 U. S. C. §§ 461(b)(6), 1813(l)(5)(a); 12 CFR § 204.128(c) (1990). All of these matters, of course, may be addressed by the Court of Appeals if necessary for a full and correct resolution of the case.

The judgment of the Court of Appeals is vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

CHIEF JUSTICE REHNQUIST, concurring.

Upon reading the opinion of the Court in this case, one may fairly inquire as to why certiorari was granted. The opinion decides no novel or undecided question of federal law, but simply recanvasses the same material already canvassed by the Court of Appeals and comes to a different conclusion than that court did. I do not believe that granting plenary review in a case such as this is a wise use of our limited judicial resources. But the Court by its grant of certiorari has decided that the case should be considered on the merits. See *Ferguson* v. *Moore-McCormack Lines, Inc.*, 352 U. S. 521, 559 (1957) (Harlan, J., dissenting). I join the opinion of the Court.

JUSTICE STEVENS, dissenting.

The Court wisely decides this case on a narrow ground. Its opinion, however, ignores an aspect of the case that is of critical importance for me.

The parties agree that Citibank assumed the risk of loss caused by either the insolvency of its Manila branch, or by an act of God.* Citibank argues that only the so-called "sovereign risk" is excluded from its undertaking to repay the de-

---

*\*E. g.*, Brief for Petitioner 16, n. 26; Brief for Respondent 15, 39–40; Tr. of Oral Arg. 10, 16 (petitioner); *id.*, at 31–32 (United States as *amicus curiae* in support of petitioner).

posit out of its general assets.   In my opinion such a specific exclusion from a general undertaking could only be the product of an express agreement between the parties.   The District Court's finding that no such specific agreement existed is therefore dispositive for me.

Accordingly, I would affirm the judgment of the Court of Appeals.