**FLEET NATIONAL BANK**

v.

**R. Gary CLARK, Tax Administrator
for the State of Rhode Island.**

No. 95–696–M.P.

Supreme Court of Rhode Island.

June 24, 1998.

Alfred S. Lombardi, Providence, for Plaintiff.

Marcia McGair Ippolito, Providence, Bernard J. Lemos, Cumberland, for Defendant.

Before WEISBERGER, C.J., and LEDERBERG, FLANDERS and GOLDBERG, JJ.

## OPINION

FLANDERS, Justice.

This case requires us to determine whether certain offshore commercial-bank deposits were exempt from Rhode Island's bank-deposits tax during the tax years ending November 1986 through 1988. The deposits in question were located at a Grand Cayman branch of the respondent Fleet National Bank (Fleet), which was then a Providence-based banking institution. These types of deposits were known as Eurodollar time deposits (Eurodollar deposits or Cayman deposits).[1] Historically Fleet had offered such deposits to its high-end commercial-banking customers as a riskier but potentially more profitable investment option than domestic deposits. Because these Cayman deposits were located offshore in a foreign jurisdiction, they were not subject to the more restrictive Federal Reserve and insurance requirements applicable to Fleet's domestic deposits, nor were they saddled with the lower interest rates payable on such deposits. Thus Fleet was able to offer its qualified commercial customers a higher potential rate of return on these Eurodollar deposits than they might otherwise have realized from domestic deposits. The question presented in this case is whether for the three tax years in question these Eurodollar deposits qualified for a tax exemption under Rhode Island's bank-deposits tax. To resolve this issue, we must interpret the applicable tax legislation and consider where these offshore deposits were "made" and where they were "payable" to depositors upon their maturity.

Following two administrative hearings, petitioner R. Gary Clark, the Rhode Island Tax Administrator (tax administrator), twice disallowed Fleet's attempts to qualify the Cayman deposits for a tax exemption under Rhode Island's bank-deposits tax law. The tax administrator concluded that the deposits failed to qualify because (1) they were not made at a branch outside Rhode Island and (2) they were payable only from Rhode Island. Fleet appealed to the District Court, and after a trial de novo a District Court judge sustained its appeal and held that the Cayman deposits were indeed exempt from the Rhode Island Tax on Bank Deposits Act, G.L.1956 chapter 15 of title 44 (the Bank Deposits Tax Act or the tax act). For the reasons set forth below, we affirm the District Court's judgment.

### Facts and Travel

In 1972 Fleet's Providence-based predecessor-in-interest, the Industrial National Bank of Rhode Island (Industrial), filed an application with the Board of Governors of the Federal Reserve System, seeking permission to establish an offshore branch office in Grand Cayman, British West Indies. Later that year the Federal Reserve Board (the Board) granted approval for the offshore branch (the Cayman branch or Cayman facility) subject to several conditions. The branch was to have no contact with the local public; its quarters, staff, and bookkeeping could be supplied by a separate service provider; and its facility had to be subject to continuing federal audits. The Board also informed Industrial that deposits "payable only at a branch * * * located outside of the States of the United States" would be exempt from any limits on interest rates and from certain reserve requirements prescribed by federal regulations. Testimony at trial revealed that the Federal Deposit Insurance Corporation (FDIC) and the Board

---

1. A Eurodollar time deposit is a deposit of United States dollars into a banking institution located outside the United States with a corresponding obligation on the part of the banking institution to repay the deposit in United States dollars. *See Citibank, N.A. v. Wells Fargo Asia, Ltd.,* 495 U.S. 660, 662–63, 110 S.Ct. 2034, 2036–37, 109 L.Ed.2d 677, 684 (1990).

had conducted annual audits of the Cayman facility since the branch's inception and that the Cayman deposits had maintained their exempt status under these federal regulations.

During the tax period relevant to this case (1986–1988), Fleet advertised the opportunity to invest in its Cayman deposits via a circular mailed to its commercial customers. The circular listed Eurodollar deposits as one of four types of money-market instruments offered by Fleet at that time and explained the deposits' attendant risk-reward factors.[2] Two features were common to the major portion of Fleet's Eurodollar deposits at issue here: (1) the depositor was a Fleet commercial customer who maintained at least $100,000 in a Fleet checking account in Providence, and (2) the depositor authorized the transfer of funds from this account for investment in Grand Cayman. Nevertheless, the maintenance of a commercial checking account in Providence apparently was not an absolute requirement to participate in Fleet's Cayman deposits program. As one witness testified, there "could be payment by a cashier's check. The customer could have another maturing investment, a CD that they could roll into the Eurodollar deposit." Or money could be directly wired by an investor into a deposit in Grand Cayman.

Much of the testimony at trial and the banking records proffered there by Fleet centered upon the sequence of events in one particular type of Eurodollar investment transaction: the aforementioned situation where funds utilized for such transactions came from a customer's Fleet checking account (also known as a demand deposit account).[3] In such situations, the commercial customer either already maintained an existing checking account with Fleet in Providence at the time of placing a Eurodollar order or that customer opened such an account to initiate the Eurodollar transaction. Once the customer had placed the requisite moneys into the checking account, the Eurodollar transaction proceeded as follows.

First, the customer would place a Eurodollar deposit order with a sales representative in Fleet's Money Management Division in Providence. The sales representative would write up a sales memorandum (containing the trade date, settlement date, maturity date, principal amount, accrued interest, fees, net amount due, and specification for delivery of proceeds at maturity) and forward the paperwork to an operations team at Fleet. This team would place the order by inputting it into Fleet's computer system. The deposit sums were then withdrawn (debited) by Fleet from the customer's account in Providence and internally reclassified into a Eurodollar liability account in the Cayman branch. Significantly, Fleet would make contemporaneous accounting-book entries upon the debiting of customer accounts in Providence and the subsequent transfer of funds to the Eurodollar accounts in Cayman. Thus, Fleet's accounting records reflected the transactions as liabilities of the Cayman branch.[4] At the same time, each Eurodollar transaction was also entered as a liability on Fleet's overall general balance sheet. Ultimately, these funds were deposited in a liability account in Cayman, and the various customer moneys were invested in Eurodol-

2. In particular the Eurodollar deposits offered higher interest rates than domestic deposits. However, they were not subject to the reserve, insurance, and other regulatory protections and requirements applicable to domestic deposits. Moreover, the depositor assumed what is called sovereign risk—that is, the risk that actions by the foreign government where the deposits were held might render them unable to be repaid upon maturity.

3. Fleet's various trial witnesses, as well as its written submissions to this Court, described the details of this particular type of "sample" transaction in an effort to explain Fleet's procedure for processing deposits for the Cayman branch.

However, as previously noted, the commencement of a Eurodollar transaction was not wholly dependent on the prior existence of a commercial customer's Fleet checking account in Providence. Two witnesses testified at trial that funding for the deposits "could go directly into a deposit in Grand Cayman" from other sources.

4. The operations manager of Fleet's Money Management Division (which was responsible for processing the Eurodollar deposits and the purchase of assets in the Cayman branch) testified that the bank booked these transactions to the Cayman branch as a liability because it was "the amount of money they would owe. It's a liability of it."

lars.[5]

Upon the maturity date, Fleet would withdraw (debit) the total amount of the commercial customer's principal and accrued interest from the bank's Cayman liability accounts. Again, Fleet's accounting records would record this transaction to show an increase in the liability of Fleet Providence to the commercial depositor. Thereafter, Fleet would credit the money to the individual customer's account in Providence (or to whatever other location the customer desired) and then would send a confirmation slip to the commercial depositor.

Fleet maintained three separate Eurodollar investment accounts in its Cayman branch. Two of those accounts were "time deposit" accounts that contained commercial customer deposits (accounts 22210 and 22213). Both these accounts were interest-bearing and each had its own maturation dates for their respective deposited funds. The funds in account 22210 matured in a period of greater than seven days while the funds in account 22213 matured in less than seven days.[6] Fleet's third account in Cayman, account 22214, was a computer-generated "sweep account" which did not earn interest. This account differed from accounts 22210 and 22213 in another critical respect. The funds that were "swept" into account 22214 emanated from accounts belonging to Fleet and not to its individual commercial customers. Therefore, movement of funds from Fleet Providence to Cayman was "an intercompany transaction" and did not require a sales memorandum from the Money Management Division.

Fleet did not report these Eurodollar deposits contained in accounts 22210, 22213, and 22214 on its Rhode Island bank-deposits tax return for the tax years ending November 1986, 1987, and 1988. Their exclusion triggered an audit by the tax administrator, which in turn resulted in the issuance of three notices of deficiency to Fleet, assessing

it $673,362.40 for outstanding tax liability. Thereafter Fleet requested administrative review of the assessments. After a formal administrative hearing on December 17, 1990, a hearing officer determined that the Eurodollar deposits did not qualify for a tax exemption under the tax act. The tax administrator thereafter adopted the hearing officer's rationale that the Eurodollar deposits were investments made with dollars already deposited in Rhode Island and were therefore not deposits made by customers at a branch or an office outside the state. Instead, he concluded, "The money is 'deposited' in Rhode Island, and the 'investment' (called a time deposit) is made from Rhode Island." Fleet subsequently paid the additional assessments and accrued interest thereon.

On September 29, 1992, Fleet requested a refund of the tax assessments. After undertaking a second administrative review based upon the submission of a stipulation of facts, the tax administrator again denied Fleet's refund claims. Fleet then filed a complaint in District Court seeking de novo review pursuant to G.L.1956 § 8–8–24. After a trial on December 20–21, 1994, the District Court held that the Eurodollar deposits contained in Fleet's three Grand Cayman accounts (accounts 22210, 22213, 22214) were exempt from taxation under the tax act. Thereafter the tax administrator petitioned this Court for a writ of certiorari, which we issued on June 13, 1996.

In support of its petition the tax administrator argues that the District Court made four separate errors of law. Accordingly he requests that we reverse the District Court's judgment. First, the tax administrator contends that the District Court's interpretation of the tax act ignored the plain and ordinary meaning of the statutory-exemption language. He posits that the act sets out a two-part test for a deposit to qualify under the exemption, both of which Fleet failed to sat-

5. The moneys deposited at Grand Cayman could not be invested in the United States but rather were earmarked for investment in international trade and commerce.

6. No commercial depositor maintained a specific individual account in his or her name at the Cayman branch. However, Fleet maintained in its Providence computer system the identity of those commercial depositors on whose behalf the funds were deposited in its Grand Cayman branch.

isfy because its Cayman deposits were neither made at a branch or an office outside Rhode Island nor payable only outside the United States. Second, the tax administrator contends that the lower court "erroneously elevated form over substance" by viewing the Eurodollar transaction as a single indivisible transaction as opposed to several distinct and separate transactions. This erroneous approach, he argues, obfuscates the true taxable event for purposes of Rhode Island bank-deposits tax laws. The tax administrator claims that this taxable event occurred when the bank's individual commercial customers made their initial deposits with Fleet in Providence. Next, the tax administrator contends that the District Court overlooked uncontradicted material evidence in the record in applying the statutory tests for deposits to be exempt from the bank-deposits tax. Finally, he alleges that the District Court erred in interpreting the Rhode Island tax statute by considering federal regulations to be persuasive.

In opposition Fleet argues that the Cayman deposits qualified under two discrete exemptions from the tax act because they were (1) made outside Rhode Island and (2) payable only from a branch located outside the United States. In essence Fleet urges us to interpret the tax act consistently with modern banking practices (pursuant to which transactions are typically accomplished via electronic and accounting means rather than by the actual physical presence or delivery of cash) such that a deposit will be considered "made at" and "payable only at" its destination as opposed to its source. Thus, even though Eurodollar funds might originate in a checking account in Providence, Fleet argues, they should be considered made and payable only at the Cayman branch because that is where the funds' travels ended. Moreover, Fleet contends that the accounting records of Fleet evidenced this fact by carrying the deposited funds as a liability of the Cayman branch.

In addition Fleet contends that federal law is not only relevant but persuasive concerning how this issue should be resolved. It claims that the tax act utilizes language virtually identical to that contained in pre-existing federal statutes concerning this same subject matter. These federal statutes exempt offshore deposits from federal interest-rate limits, FDIC insurance coverage, and reserve requirements if they are payable only at a bank office located outside the United States. According to Fleet, because federal regulators have deemed the Cayman deposits to be exempt from these various federal requirements that employ the same language and similar qualifying tests as does the Rhode Island statute, this federal construction should be of at least some interpretive interest to us in construing Rhode Island's statutory language, particularly with regard to whether under the tax act Eurodollar deposits are "payable only at an office located outside of the United States."

### Standard of Review

■ On a petition for certiorari from a District Court judgment reversing the tax administrator's final decision, this Court may only address alleged errors of law, including issues that involve the applicability of the Rhode Island tax statute to undisputed facts. *See Dart Industries, Inc. v. Clark,* 696 A.2d 306, 309 (R.I.1997). We cannot weigh the evidence in the record to resolve any factual disputes between the parties. Instead, our scope of review is limited to the question of whether the District Court's decision below "is affected by error of law or whether legally competent evidence exists in the record to support the findings of the trial judge." *Id.*

### Analysis

In years past Rhode Island banking institutions have been subjected to a tax based upon the value of their average daily deposits in Rhode Island.[7] Such banks were required to file two separate bank-deposits tax returns each year with the tax administrator. *See* § 44–15–5. "Deposits" were defined by the Bank Deposits Tax Act to include "deposits or savings made under any type of deposit or

---

7. Presently this tax is not being assessed. The General Assembly has provided that "[f]or the period beginning January 1, 1998 and thereafter the [bank-deposits] tax rate shall be zero for all deposits." G.L.1956 § 44–15–2.

savings plan represented by certificates of deposit, savings bonds, or income certificates issued by any banking institution, or however such or similar time deposits or savings plan may otherwise be designated." Section 44–15–1(2)(ii). In addition a deposit was to include only those accounts that bore interest or that were entitled to dividends. *See* § 44–15–1(2)(i)(A). Moreover, for purposes of levying a bank-deposits tax, the General Assembly expressly excluded certain categories of deposits from its definition of the term:

> "[T]he terms 'deposits' or 'time deposits' as hereinabove used *shall not include any deposits of a branch or office of any banking institution located outside of this state,* whether it is established de novo or acquired pursuant to an interstate merger, consolidation, or acquisition, *provided that the deposits* [1] are *made at a branch or office outside of this state,* or an international banking facility of any banking institution * * * or [2] which are payable only at an office located outside of the United States.*" Section 44–15–1(2)(ii). (Emphases added.)

██ The key dispute in this case is whether the Cayman deposits qualified for such an exemption by satisfying one or more of the aforementioned exclusion provisions delineated by the General Assembly in the tax act. Because this question is a matter of statutory construction, we first look to the plain and ordinary meaning of the exemption language. "If the language is clear on its face, then the plain meaning of the statute must be given effect" and this Court should not look elsewhere to discern the legislative intent. *Gilbane Co. v. Poulas,* 576 A.2d 1195, 1196 (R.I.1990).

Here, § 44–15–1 appears unambiguous in laying out a two-part test for deposits to have achieved tax-exempt status. First, the deposits had to be located in a branch or an office of a banking institution located outside Rhode Island. Second, they had to satisfy one of two subtests: (1) they must have been made either at a branch or an office of a bank located outside Rhode Island or at an international banking facility, or (2) they must have been payable only at an office located outside the United States. Because the tax administrator does not dispute that the deposits in question satisfied the statute's first exemption criterion (that the Eurodollar deposits be located at a branch or office located outside Rhode Island), we turn our attention to whether these deposits satisfied one or both elements of the second set of criteria for deposits to be exempt from the bank-deposits tax.[8]

## I

### Whether the Eurodollar Deposits Were Made at a Branch or Office Located Outside Rhode Island

██ The tax administrator urges us to interpret literally the Legislature's requirement that the Eurodollar deposits be "made at a branch or office outside of this state." He argues that a deposit was made where the customers initially placed their deposit orders and where they put their funds before they were reclassified by the bank, and then invested offshore. The tax administrator specifically relies on the trial testimony of Fleet's employees. That testimony, he says, shows that Eurodollar deposits originated from Fleet accounts. Thereafter only Fleet Providence interacted with its Cayman branch, and there were no customer-initiated transfers of funds between one customer account (in Providence) and another *existing* customer account (in Cayman). Thus he contends the taxable event for purposes of the tax act was the customers' initial deposit, arguing that "how, when and where Fleet

8. Although the tax administrator states in his brief that one of the two "statutory alternatives"—deposits made at a branch outside Rhode Island or at an international banking institution—is "not at issue here," we shall nevertheless proceed to consider the "made at a branch outside Rhode Island" alternative because the tax administrator also argued in his brief and at oral argument that "the disputed deposits are *not* made at a branch or office located outside of

Rhode Island" but rather "in Providence, R.I." With regard to whether the "made at an international banking facility" exemption applies to this dispute, the tax administrator asserts that the Eurodollar deposits were not made at an international banking facility, and Fleet does not attempt to invoke this particular exemption in any event. Accordingly we decline to discuss the applicability of this language to the case at bar.

subsequently invested its customers' deposits are immaterial."

We are not persuaded by the tax administrator's arguments on this point for two reasons. First, even if we were to adopt the tax administrator's source-of-origin theory to determine where these deposits were made for tax purposes, his theory ignores other trial testimony indicating that the Cayman deposit funds "can and occasionally do" originate from sources other than Fleet's commercial customers' checking accounts in Providence. Trial testimony revealed that they could also be "wired from another location, another bank, another country, could be in the form of a cashier's check [or could] come in a number of ways." One Fleet witness testified that an individual interested in making a Eurodollar deposit could simply have his or her money "go directly into a deposit in Grand Cayman" in that particular individual's name. Thus the tax administrator is incorrect in his assertion that "before any [Eurodollar] investment can occur, deposits must first be made in Providence."

Moreover, we believe that the nature and the reality of modern banking transactions argue in favor of a broader view of how a deposit is made than the one advanced by the tax administrator. A proper perspective should consider the destination of deposited funds and not merely their origin. Because many banking transactions are now implemented by electronic and accounting means (rather than by the physical delivery of cash), see, e.g., Citibank, N.A. v. Wells Fargo Asia, Ltd., 495 U.S. 660, 663, 110 S.Ct. 2034, 2037, 109 L.Ed.2d 677, 685 (1990) (discussing electronic wire transfers effecting the transfer of funds to and from an offshore Eurodollar deposit account), a more contemporary view recognizes that a deposit is made when there is a corresponding accounting-book entry at the place of the funds' destination. Cf. 12 U.S.C. § 1813(l)(5)(A) (exempting from the definition of a deposit any obligation of a depository institution "which is carried on the books and records of an office of such bank or savings association located outside of any State"—unless it is payable in the United States) (emphases added).

According to the trial testimony in this case, each debit of a commercial depositor's account and the subsequent transfer of funds to the Cayman liability accounts was reflected on the accounting books of Fleet as an amount owed by the Cayman branch and not by Fleet Providence. In our judgment, that entry represents a more accurate indication of exactly where the deposited funds were made for tax purposes than does the place where the funds were first provided to the bank.[9] Accordingly, we agree with Fleet that once a deposit is booked at a particular banking location, it should be considered to have been "made" there so long as the funds to support that book entry are contemporaneously recorded as a liability to the Cayman branch and, additionally, the movement of those funds can be traced to the Cayman branch.

 We are also convinced that the book-entry accounting approach we adopt here is fully consonant with established banking principles concerning the taxable location of bank deposits. "[F]or taxation purposes, money is transitory property; its mere presence on deposit in a bank does not necessarily render it subject to taxation there." 8 Michie on Banks and Banking, ch. 19, § 32 at 544 (1988). The general rule is that property of an intangible nature—such as bank deposits—"has no situs of its own for purposes of taxation, and is therefore assessable only at its owner's domicile, regardless of the actual location of the evidence of such debt." Id. at 541. The tax situs of a bank deposit depends on whether the deposited funds are the property of the bank or of the depositor. Id. at 544. This question of ownership, in turn, depends on whether that initial deposit is deemed special or general. 5A Michie on Banks and Banking, ch. 9, § 3 at 36–37 (1994). Thus, even though funds may have been deposited in Rhode Island initially,

9. We recognize that blind reliance on a book-entry accounting approach might tend to facilitate the ability of a bank to circumvent tax laws through unscrupulous or fraudulent accounting methods. However, when, as here, each book entry can be verified by the actual movement of funds to a branch or an office located outside Rhode Island, the dangers posed by adopting this standard are less problematic.

their tax situs may nevertheless lie elsewhere depending on the character of those deposits as general or special.

Although we agree with the tax administrator that funds deposited in Rhode Island for investment in Cayman were general deposits (whereby a depositor parts with the title to the deposited funds subject to the bank's contractual obligations to repay the funds on order), we disagree regarding the significance of this fact. The tax administrator essentially contends that the taxable location for such funds is Rhode Island because a debtor-creditor relationship began there upon the customers' depositing of the funds. But once it has been determined that the depository (and not the commercial depositor) was the owner of the deposited funds because of their character as general deposits, it follows that the tax situs is the bank branch where that deposit is carried as a debt of the bank. See Vishipco Line v. Chase Manhattan Bank, N.A., 660 F.2d 854, 862 (2d Cir.1981) (quoting Heininger, Liability of U.S. Banks for Deposits Placed in Their Foreign Branches, 11 Law & Pol.Int'l Bus. 903, 975 (1979)). Accordingly, we believe that the Cayman branch is the proper tax location for the deposits at issue here. The "owner" of the debt owed by the bank was the Cayman branch because it carried the bank's debt to the Eurodollar depositors as a liability on Fleet's accounting records and because funds for such deposits were actually located there. Accordingly, Grand Cayman was the tax situs of the Eurodollar funds.

## II

### Whether the Eurodollar Deposits Were Payable Only at an Office Located Outside the United States

■ We also hold that the Cayman deposits were tax-exempt because they were payable only at an office located outside the United States. Our reasons for doing so are explained below.

First, because the location of the debt incurred by Fleet upon a customer's Eurodollar deposit order was the Cayman branch, see supra, that debt could only be paid at Grand Cayman.[10] Second, in a manner consistent with the book-entry approach discussed above, any interest paid on a customer's principal deposit with Fleet was debited from the Cayman liability accounts and was therefore payable at Cayman. It is undisputed that during the relevant tax period, the Eurodollar deposits were carried as a liability only by Fleet's Cayman branch. Hence, before Fleet paid its debt to its commercial customers after the maturity of their Eurodollar investments, it first made a book entry reducing that liability of its Cayman branch. Although Fleet eventually posted (in the accounting sense) the interest earned on the Cayman deposits to the depositors' Rhode Island accounts, before any interest was posted back into a Rhode Island account, a book entry reducing the Cayman branch's liability for the Eurodollar deposit was made.[11]

■ Finally, we agree with the District Court that the interpretations placed upon

10. We reject the tax administrator's argument that the Eurodollar deposits are not payable only at Grand Cayman because commercial customers seeking to withdraw the funds could not go to Grand Cayman to get payment. First, this contention ignores the evidence in the record that arrangements could be made for customers to withdraw their deposited funds in Grand Cayman upon the maturity of their investment. Moreover, it is of no import that once such arrangements were made, a customer could retrieve the moneys owed only by having funds wired to the Cayman branch from Fleet Providence. We agree with Fleet that "payable at" is a modern banking term whose meaning is not derived from the physical origin of funds used to satisfy a debt; instead it is equivalent to the location at which a debt is discharged—that is,

where a book-entry liability is reduced upon repayment to a depositor at the time of the debt's maturity. See Citibank, 495 U.S. at 669, 110 S.Ct. at 2040, 109 L.Ed.2d at 688 (distinguishing between location of collection and location of repayment).

11. We also note that our decision does not foreclose the possibility of any type of other taxes being assessed by Rhode Island on these Eurodollar transactions. For example, the posting of interest accumulating from the Eurodollar accounts to the customers' demand-deposit accounts in Rhode Island may well qualify as a taxable event for income tax purposes. However, this question is not before us.

federal banking laws and regulations similar to those in question here, although not controlling, are indeed instructive for the purpose of construing the Rhode Island bank-deposits statute.[12] Section 44–15–1 employs language that is virtually identical to that in the federal statutes that predate the enactment of the Rhode Island Tax Act.[13] And a state implicitly adopts the interpretation of a statute by the courts of a particular jurisdiction when it later borrows statutory language from that jurisdiction. *See Laliberte v. Providence Redevelopment Agency*, 109 R.I. 565, 575, 288 A.2d 502, 508 (1972). Here, as noted by the District Court, federal authorities (the FDIC, the Office of the Controller of the Currency (OCC), and the Federal Reserve Board) have determined that the Cayman deposits are exempt from Federal Reserve and interest-rate requirements that are applicable to domestic deposits because they are payable only outside the United States. To adopt the position advanced by the tax administrator (who urges us to ignore these federal rulings) would result in an anomaly: the Cayman deposits would be payable in Providence for purposes of Rhode Island's tax act but payable only outside the United States for purposes of federal banking laws. Our contrary interpretation avoids this unnecessary conflict over the manner in which this same statutory language should be construed and applied.

### Conclusion

Accordingly we hold that the Eurodollar deposit accounts qualified for tax-exempt status under Rhode Island's Bank Deposits Tax Act. The funds contained in account 22214 (the Fleet general sweep account) never bore any interest, either in Grand Cayman or in Rhode Island, and therefore failed to come within the purview of the tax act's requirement that a deposit "bear interest or [be] entitled to dividends" in order to be taxable. *See* § 44–15–1(2)(i)(A). And the funds in accounts 22210 and 22213—both interest-bearing liability accounts in Fleet's Cayman branch—were not only deposits "made at a branch or office outside of this state" but were also "payable only at an office located outside of the United States." As the District Court judge stated, "[i]t is incredulous [sic] to this court that the higher interest rates that accrued to these [Eurodollar] customers' accounts would have been paid if the deposits remained at Fleet Providence after the purported trade [of funds from Fleet Providence to the Cayman Branch]. The higher interest was paid on these accounts in conjunction with the greater risk that was attendant on such transactions."

Therefore, the petition for certiorari is denied, and the writ previously issued is quashed. The judgment of the District Court is affirmed, and the papers of the case shall be returned to the District Court with our decision endorsed thereon.

BOURCIER, J., did not participate.

12. We reject the tax administrator's argument that the District Court was precluded from considering federal regulations in any way. Under Rhode Island law every court in this state is empowered to take judicial notice of the common law and statutes of every state, territory and other jurisdictions of the United States. *See* G.L. 1956 § 9–19–3; *see also* 9 *Wigmore on Evidence* § 2573, at 765–66 (Chadbourn rev. 1981). Moreover, Rhode Island courts are free to inform themselves of federal law in such manner as they deem appropriate. *See* § 9–19–4.

13. *See, e.g.,* 12 U.S.C. § 461(b)(6) (exempting from Federal Reserve requirements "deposits payable only outside the States of the United States"); 12 U.S.C. § 1813(*l*)(5)(A) (excluding from definition of deposits insured by FDIC "any obligation * * * which is payable only at an office * * * located outside of the states of the United States") (language in effect prior to 1994 amendment, P.L. 103–325, § 326(b)(2)); 12 U.S.C. § 371a (excluding from prohibition of the States against payment of interest on demand deposits "any deposit * * * which is payable only at an office * * * located outside of the States of the United States").